639 So.2d 707 (1994)
STATE of Louisiana
v.
ALL PRO PAINT & BODY SHOP, INC. and William J. Hampton.
No. 93-KA-1316.
Supreme Court of Louisiana.
July 5, 1994.
*708 Richard Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., Thomas Carl Walsh, Jr., Gwendolyn K. Brown, Asst. Dist. Attys., for appellant.
John P. Aydell, Jr., Guy E. Wall, Gordon, Arata, McCollam & Duplantis, for appellee.
Meredith Hoag Lieux, Veronica Jones-Matthews, amicus curiae, for Dept. of Environmental Quality.
Mary Patricia Jones, amicus curiae, for Richard P. Ieyoub.
James Clifford Dixon, amicus curiae, for Dept. of Public Safety & Corrections.
George Davidson Fagan, amicus curiae, for Balehi Marine Inc.
KIMBALL, Justice.[*]
The State appeals a judgment of the Louisiana First Circuit Court of Appeal declaring a criminal penalty provision of the Louisiana Hazardous Waste Control Law unconstitutional as a delegation to the executive branch of legislative authority to define a felony.[1] We reverse.

I
On or about December 5, 1990, defendant William J. Hampton, the owner and operator of defendant All Pro Paint & Body Shop, Inc., paid scrap dealer Freddie Donahue $100.00 to dispose of a number of containers of spent paint thinner generated in the operation of the paint and body shop. Donahue deposited the containers in two uninhabited houses in Baton Rouge. The owner of the houses later discovered the containers and reported the discovery to the authorities.
Officials from the Department of Environmental Quality (DEQ) and the State Police recovered more than thirty containers containing an estimated 660 gallons of material. Experts subjected samples of material gathered from the containers to laboratory analysis. Each of at least fourteen samples ignited or reached its "flashpoint" at less than 140° Fahrenheit. A substance having a flashpoint of less than 140° Fahrenheit or 60° Centigrade is classified as hazardous waste under the Louisiana Hazardous Waste Control Law (HWCL), La.R.S. 30:2171-2207, and under the regulations promulgated pursuant thereto by DEQ, LAC 33:V.101-5145. Specifically, the HWCL defines hazardous waste as follows:
"Hazardous waste" means any waste, or combination of wastes, which because of its quantity, concentration, physical, or chemical characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed. Such definition shall be applied only to those wastes identified and designated as such by the department, consistent with applicable federal laws and regulations.
La.R.S. 30:2173(2).[2] A DEQ regulation designates as one category of hazardous wastes those materials which exhibit the characteristic of "ignitability" by having a flashpoint of less than 140° Fahrenheit or 60° Centigrade as determined by specified testing procedures. LAC 33:V.4903(A) and (B).
After tracing the containers to Hampton and All Pro, officers obtained a search warrant and seized documents including Hampton's notification to DEQ of an intent to generate hazardous waste on the premises of the paint and body shop, Hampton and All *709 Pro's 1990 Report for Generators of Hazardous Waste, hazardous waste manifest forms for generators, labels for hazardous waste containers listing All Pro's generator identification number, a hazardous waste material profile describing the types of waste the shop would generate and disposal requirements of that waste, and service contracts between Hampton and All Pro and companies authorized to transport and dispose of hazardous waste generated by the paint and body shop. Additionally, DEQ records showed that Hampton and All Pro had filed with DEQ a notification of their intent to transport hazardous wastes and that defendants were authorized by DEQ to transport designated materials in compliance with the HWCL and applicable rules and regulations. Neither Hampton nor All Pro were authorized to store or dispose of hazardous wastes, nor was Freddie Donahue authorized to transport, store, or dispose of hazardous wastes. Needless to say, the residential neighborhood where the containers were found was not a DEQ-authorized disposal site.
An East Baton Rouge Parish grand jury indicted Hampton and All Pro for illegal transportation, storage, and disposal of hazardous waste in such a manner that they knew or should have known they thereby placed another person in imminent danger of death or serious bodily injury, all in violation of La.R.S.30:2183 which provides in pertinent part:
§ 2183. Notice; permits and licenses; enforcement; violations; penalties; notification
A. No later than ninety days after the effective date of the regulations authorized by this Chapter, every person not otherwise exempt who generates, transports, or desires to transport in the state any hazardous waste or who owns, operates, or desires to own or operate a treatment, storage, transfer, or disposal facility which handles hazardous wastes within the state shall file with the secretary or commission a notification stating the nature and location of the activity conducted or desired to be conducted and, if required by regulations, a request for an application for any necessary licenses, permits, schedules of compliance, or performance guidelines....
B. It shall be unlawful to initiate or continue the generation, transportation, treatment, storage, or disposal of hazardous wastes after the time period provided in Subsection A of this Section except in compliance with the notice requirements thereof.
C. Upon receipt of the notices required in Subsection A of this Section or as soon as practicable thereafter, the secretary shall initiate the procedures as required by this Chapter and the regulations applicable thereto for the issuance or denial of permits and licenses and the establishment of schedules of compliance and performance guidelines for facilities and equipment.
. . . .
E. Upon the issuance of a license or permit or the establishment of a schedule of compliance or performance guidelines, it shall be unlawful to transport, treat, store, or dispose of hazardous wastes except in accordance with the terms and conditions thereof and the regulations applicable thereto.
. . . .
G. . . .
(2) Any person who knowingly transports, treats, stores, disposes of, or exports any substance in contravention of any provisions of this Chapter or the regulations or of any permit or license terms and conditions adopted in pursuance thereof, or any person who otherwise knowingly violates any provisions of this Chapter, in such manner that he knows, or should have known, at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than two hundred fifty thousand dollars per day of violation and costs of prosecution, or imprisonment at hard labor for not more than fifteen years, or both.[3]
*710 The HWCL defines disposal, storage, and transportation as follows:
(1) "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water so that such waste, or any constituent thereof, may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
. . . .
(4) "Storage" means the containment of hazardous waste on a temporary basis, for such time as may be permitted by regulations, in such a manner as not to constitute disposal of such hazardous waste.
. . . .
(6) "Transportation" means the movement of hazardous wastes from the point of generation or storage to the point of treatment, storage, or disposal by any means of commercial or private transport. The term does not apply to the movement of hazardous wastes on the premises of a hazardous waste generator or on the premises of a permitted hazardous waste treatment, storage, or disposal facility.
La.R.S. 30:2173.
Defendants entered pleas of not guilty and filed a motion to quash the indictment alleging the statutory and regulatory scheme governing hazardous waste constitutes an unconstitutional delegation of legislative authority to the executive branch. The trial court denied the motion to quash and, following a bench trial, acquitted defendants on the charge of illegal storage of hazardous waste and convicted them as principals on the charges of illegal transportation and disposal of hazardous waste in violation of La.R.S. 30:2183(G)(2). The court deferred imposition of sentence pursuant to La.C.Cr.P. art. 893 and placed defendants on active supervised probation for three years with the special conditions that defendants make restitution to DEQ in the amount of $13,500.00, reimburse the State for expert witness fees in the amount of $2142.74, perform 200 hours of community service, pay court costs, and pay $250.00 to Crimestoppers.
On appeal to the Louisiana First Circuit Court of Appeal, Hampton and All Pro argued the evidence was insufficient to uphold their convictions and re-urged their argument in support of their motion to quash the indictment on the grounds the HWCL unconstitutionally delegates legislative authority to the executive branch. The court of appeal, with one member of a three-judge panel dissenting, reversed defendants' convictions and sentences and granted their motion to quash the indictment, declaring La.R.S. 30:2183(G)(2) unconstitutional as a delegation to the executive branch of legislative authority to define a felony. State v. All Pro Paint & Body Shop, Inc., 618 So.2d 962, 969 (La. App. 1st Cir.1993).[4] The court of appeal rejected defendants' argument that the evidence is insufficient to uphold their convictions, id. at 965, and after a thorough review of the record, we find no error in the court of appeal's findings on that issue. See State v. Lee, 93-2810, p. 11 n. 12 (La. 5/23/94), 637 So.2d 102 n. 12.
The sole issue on appeal in this court is whether La.R.S. 30:2183(G)(2) constitutes an unconstitutional delegation to the executive branch of legislative authority to define a felony.

*711 II

A
The Louisiana Constitution divides the powers of state government into "three separate branches: legislative, executive and judicial." La. Const. art. II, § 1. The constitution further provides: "Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others." La. Const. art. II § 2. As the constitution vests the legislative power exclusively in the legislature, La. Const. art. III, § 1(A), and as "the determination and definition of acts which are punishable as crimes are purely legislative functions," State v. Taylor, 479 So.2d 339, 341 (La.1985); State v. Rodriguez, 379 So.2d 1084, 1085 (La.1980), it follows that the legislature cannot delegate to another branch its power to create and define criminal offenses.[5]Taylor, 479 So.2d at 341; State v. Broom, 439 So.2d 357, 367 (La.1983); Rodriguez, 379 So.2d at 1085; State v. Maitrejean, 193 La. 824, 834, 192 So. 361, 364 (1939); City of Shreveport v. Price, 142 La. 936, 945, 77 So. 883, 886 (1918).
Recognizing that the Louisiana Constitution unequivocally mandates the separation of powers among the three branches of state government, this court in delegation cases traditionally has distinguished between delegations of purely legislative authority, which necessarily violate the separation of powers, and delegations of ministerial or administrative authority, which do not. The court explained the distinction in Schwegmann Brothers Giant Super Markets v. McCrory, 237 La. 768, 787-88, 112 So.2d 606, 613 (1959) (footnotes omitted) (emphasis added):
Due to the complexity of our social and industrial activities, the decisions display an increasing tendency to hold as nonlegislative the authority conferred upon commissions and boards to determine the facts or state of things upon which the law intends to make its action depend. It is now well settled that the Legislature may make the operation or application of a statute contingent upon the existence of certain conditions, and may delegate to some executive or administrative board the power to determine the existence of such facts and to carry out the terms of the statute. So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.
See also Taylor, 479 So.2d at 343 ("When the delegated authority is unfettered ..., its exercise becomes legislative, not administrative, in nature, and contravenes the mandate of Article 2, Section 2 of the Louisiana Constitution") (emphasis added); Rodriguez, 379 So.2d at 1087 ("The legislature may confer ministerial powers upon executive agencies if it supplies adequate standards to execute the legislative policy; however it cannot surrender the legislative power itself to determine what the law shall be") (emphasis added); City of Alexandria v. Alexandria Fire Fighters Ass'n, 220 La. 754, 758, 57 So.2d 673, 674 (1952) (the delegation doctrine "does not forbid the delegation of powers which are not purely legislative, that is, powers which may properly be exercised by the lawmaker but which are of a nonlegislative character") (emphasis added); see State v. Morgan, 238 La. 829, 844, 116 So.2d 682, 687 (1960); National Bank of Commerce v. Louisiana State Univ., 206 La. 913, 934, 20 So.2d 264, 270 (1944); City of Baton Rouge v. Shilg, 198 La. 994, 998, 5 So.2d 312, 313 (1941).
Consistent with the distinction drawn in Schwegmann between delegations of legislative authority versus delegations of administrative or ministerial authority, the court on numerous occasions has recognized that where an enabling statute expresses a clear legislative policy and contains sufficient standards for the guidance of the administrative official empowered to execute the legislative will, the legislature may delegate to an administrative *712 agency the administrative or ministerial authority to ascertain and determine the facts upon which the law is to be applied and enforced. Taylor, 479 So.2d at 341; Adams v. State, Dept. of Health and Human Res., 458 So.2d 1295, 1298 (La.1984); State v. Union Tank Car Co., 439 So.2d 377, 380 (La.1983); Rodriguez, 379 So.2d at 1086; Johnson v. Pearce, 313 So.2d 812, 819 (La.1975); Alexandria Fire Fighters, 220 La. at 758-59, 57 So.2d at 674; State v. Guidry, 142 La. 422, 431, 76 So. 843, 846 (1917).[6]
Guided by the principles set forth in Schwegmann and inherent in the constitutional separation of powers, this court has fashioned a three-prong test for determining on a case-by-case basis whether a statute unconstitutionally delegates legislative authority, as opposed to ministerial or administrative authority, to an administrative agency: a delegation of authority to an administrative agency is constitutionally valid if the enabling statute (1) contains a clear expression of legislative policy, (2) prescribes sufficient standards to guide the agency in the execution of that policy, and (3) is accompanied by adequate procedural safeguards to protect against abuse of discretion by the agency. State v. Barthelemy, 545 So.2d 531, 534 (La.1989); Adams, 458 So.2d at 1298; Union Tank Car, 439 So.2d at 381. This test, which embodies the delegation doctrine as it has evolved in the Louisiana jurisprudence,
serves two primary functions vital to preserving the separation of powers required by the Constitution. First, it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people. Second, it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged.
Arizona v. California, 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963) (Harlan, J., dissenting in part) (footnote omitted).[7]
Application of the Schwegmann three-prong test ensures the elected members of the Louisiana Legislature retain all legislative power by insisting that they, not their delegates in the executive branch, make the difficult policy choices for which they are accountable to the public through the democratic process. Furthermore, by insisting that the enabling statute prescribe not only the legislative policy to be enforced by the agency but also sufficient standards to guide or "canalize" the agency's execution of the *713 legislative will, the test ensures the statute delegates only administrative or ministerial authority and guards against delegations of unbridled legislative discretion and the danger of "delegation running riot."[8] Additionally, because even delegations of administrative or ministerial authority require agencies to exercise some discretion in executing the legislative will, the requirement of adequate procedural safeguards ensures the agency exercises that discretion in accordance with the policy and standards prescribed in the enabling statute and consistent with democratic values served by public participation and judicial review.[9]

B
In the present case, the court of appeal concluded the Schwegmann three-prong test was not applicable to test the validity of the delegation to DEQ in La.R.S. 30:2183(G)(2). Interpreting this court's decisions in State v. Broom, 439 So.2d 357 (La. 1983), and State v. Taylor, 479 So.2d 339 (La.1985), the court of appeal concluded:
[T]he supreme court has adopted a new test as to the constitutionality of the delegation of legislative authority as it relates to felony offenses. The three prong test of Schwegmann, as enunciated in State v. Barthelemy, 545 So.2d 531, 534 (La.1989), used generally to test the validity of the delegation of legislative authority has in the instance of creating or defining felony offenses been put aside in favor of a one step test. This new test is limited to a review of the statute itself which creates or defines the felony offense. The legislature cannot delegate to the executive branch, under however stringent guidelines, the authority to fill in the details of what constitutes a felony under the statute.
All Pro, 618 So.2d at 967.[10]
We reject the court of appeal's interpretation of Broom and Taylor. In Broom, the delegation under attack authorized the Department of Public Safety to promulgate regulations setting forth minimum standards governing the manufacture, transportation, use, sale, handling, and storage of explosives "as are reasonably necessary for the protection of the health, welfare and safety of the public" and in conformity with "the published rules and standards of the Institute of Makers of Explosives," La.R.S. 40:1471.9, and declared it a felony to violate any such regulation. La.R.S. 40:1471.18. On original hearing, after perceiving "a need to examine more acutely the procedural safeguards mandated by the Legislature and/or adopted by the administrative agency, while de-emphasizing the imperative need for statutory standards," Broom, 439 So.2d at 362, the court upheld the delegation, primarily resting its decision on the existence of procedural safeguards imposed on the rulemaking process pursuant to the Louisiana Administrative Procedure Act, La.R.S. 49:951-970.[11]Id. at 363-64.
On rehearing, the Broom court held "LSA-R.S. 40:1471.9 unconstitutionally delegates authority to the director of public safety *714 to define the felony offenses punishable under LSA-R.S. 40:1471.18." Id. at 369. The court stated in no uncertain terms that "the legislature cannot delegate the right to define felony offenses to administrative bodies or department heads." Id. However, this pronouncement did not change the law but merely reaffirmed the well settled rule, recited above, that the legislative power to create and define criminal offenses cannot be delegated. In other words, consistent with the Louisiana jurisprudence in delegation cases, the Broom court on rehearing implicitly found the statute in that case unconstitutionally delegated legislative, as opposed to administrative or ministerial, authority. The delegation in Broom failed not because violations of the regulations were punishable as felony offenses, but because the enabling statute failed to prescribe sufficient standards to guide the exercise of agency discretion in promulgating those regulations. Indeed, the gravamen of the Broom opinion on rehearing was its rejection of the suggestion offered on original hearing "that safeguards against arbitrary action are more important than standards." Id. at 367.
In Taylor, the other case on which the court of appeal relied, the court explicitly found the enabling statute "fails to prescribe sufficient standards by which the power delegated is to be exercised." Taylor, 479 So.2d at 343. The delegation under attack in that case authorized administrators of state correctional institutions to determine the meaning of "contraband," possession of which by inmates constituted a felony under La.R.S. 14:402(B). The statute provided in pertinent part that "contraband shall be defined as any article, substance, or thing which is not issued by the authorities operating the facility, sold through the institutional canteen, specifically permitted by applicable regulations, or otherwise specially authorized by the head of the facility or his designee." La.R.S. 14:402(A). Comparing the statute with a former version of the same statute which had been upheld against a delegation challenge in State v. Morgan, 238 La. 829, 116 So.2d 682 (1960), the court noted:
The former statute delegated to officials within prescribed limits the authority to make exceptions in isolated instances to the exclusive list of articles defined as contraband. The degree of authority delegated by former La.R.S. 14:402(A) was minimal and the statute was considered to be administrative, not legislative, in its nature.
Taylor, 479 So.2d at 342. In contrast, observed the court, the present statute allowed "such latitude to determine what is and is not contraband, the legislature has vested in the head of a facility or his designee the authority to define and redefine what is criminal conduct." Id. at 343. Accordingly, the court declared the statute unconstitutional, concluding: "When the delegated authority is unfettered as here, its exercise becomes legislative, not administrative, in nature, and contravenes the mandate of Article 2, Section 2 of the Louisiana Constitution." Id. Nothing in the Taylor opinion suggests a departure from this court's prior jurisprudence applying the principles set forth in Schwegmann.
Thus, although the court in both Broom and Taylor recited the well settled rule that legislative power to create and define criminal offenses cannot be delegated, neither decision creates a "new test," as found by the court of appeal, under which delegations would be struck down solely because the authority delegated "relates to" felony offenses. On the contrary, each decision rests on the court's finding that the delegation under attack failed to prescribe sufficient standards to guide the agency's exercise of discretion and therefore amounted to an unconstitutional delegation of legislative authority to create or define a felony. Moreover, far from establishing a rule that "[t]he legislature cannot delegate to the executive branch, under however stringent guidelines, the authority to fill in the details of what constitutes a felony under the statute," All Pro, 618 So.2d at 967, both decisions reaffirm the principles embodied in the Schwegmann three-prong test under which an enabling statute, supported by a clear expression of legislative policy, sufficient standards, and adequate procedural safeguards, does not unconstitutionally delegate legislative authorityeven if the authority delegated "relates to" felony offensesbut *715 instead properly delegates only administrative or ministerial authority to "determine[] within prescribed limits some fact upon which the law by its own terms operates." Schwegmann, 237 La. at 788, 112 So.2d at 613. "[T]he authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense." United States v. Grimaud, 220 U.S. 506, 521, 31 S.Ct. 480, 484, 55 L.Ed. 563 (1911).
In short, the court of appeal erred in concluding this court in Broom and Taylor "adopted a new test as to the constitutionality of the delegation of legislative authority as it relates to felony offenses." All Pro, 618 So.2d at 967.

III
Applying the "one step test" it erroneously believed this court had adopted in Broom and Taylor, the court of appeal held La.R.S. 30:2183(G)(2) unconstitutionally delegates legislative authority to DEQ. The court reasoned:
Here, without question this entire statutory scheme does not define the felony offense, but merely sets guidelines for the definition of the offense. Hazardous waste is not defined in the statute except in general terms, leaving to the executive the duty to devise a more definitive definition or description of hazardous waste. Thus, the result is an unconstitutional delegation of constitutional authority to the executive branch.[12]
All Pro, 618 So.2d at 968. As shown below, had the court of appeal applied the Schwegmann three-prong test to determine the constitutionality of La.R.S. 30:2183(G)(2), it would have concluded the statute delegates only ministerial or administrative authority to DEQ, not legislative authority.[13]
The Schwegmann test first requires us to determine whether the enabling statute, the HWCL, contains a clear expression of legislative policy. In Johnson v. Pearce, 313 So.2d 812, 819 (La.1975), we stated, "Once the legislature has defined its policy ..., the State, acting under its police power to protect the health, welfare and safety of the people, may confer upon administrative officers or bodies the power to adopt the rules and regulations to effectuate the legislative will." See also Union Tank Car, 439 So.2d at 381. Thus, the requirement of a clear expression of legislative policy ensures the regulatory scheme constitutes a valid exercise of the State's police power to protect the health, welfare, and safety of the people, thereby permitting an administrative agency to make rules and regulations necessary for the administration and enforcement of that policy. Johnson, 313 So.2d at 819; Union Tank Car, 439 So.2d at 381.
The HWCL states its policy and purpose as follows:
§ 2172. Policy and Purpose
A. The legislature finds and declares that:
(1) The manufacture, refinement, processing, and treatment of petroleum, natural gas, raw chemicals, ores, and other natural and synthetic products is a basic and essential activity making a significant contribution to the economy of this state.
(2) This activity often produces byproducts and wastes of a character and in quantities that pose substantial present and potential danger to the health and safety of the citizens of this state and to the integrity of the environment unless such wastes and byproducts are transported, *716 treated, stored, and disposed of in a prudent and responsible manner.
(3) Present state laws and regulations applicable thereto are inadequate to assure that necessary safeguards and practices are adhered to on a continuing basis in matters pertaining to the transportation, treatment, storage, and disposal of such hazardous wastes, which has resulted in substantial abuse of the environment, damage to private and public property and unnecessary endangerment of the health and safety of the citizens of this state.
B. In order to diminish the risks to which the citizens and environment of this state are being exposed it is in the public interest, and within the police power of the state, to establish a framework for the regulation, monitoring, and control of the generators, transportation, treatment, storage, and disposal of such hazardous wastes, and it is the declared purpose of this Chapter to authorize the development, implementation, and enforcement of a comprehensive state hazardous waste control program.
La.R.S. 30:2172.
The HWCL's policy and purpose provision establishes a reasonable and definite governmental policy warranting the exercise of the State's police power to protect the public health, safety, and welfare by regulating hazardous waste. The legislature identifies the competing interests at stakeindustry on the one hand and the health and safety of the citizens and integrity of the environment on the otherwhile acknowledging the inadequacy of present state laws and regulations to reconcile those interests or to prevent resulting harms to the environment, property, and people of the State. Having established the need for legislative action "in the public interest," the legislature then declares its intention to address that need by establishing "a framework for the regulation, monitoring, and control of the generators, transportation, treatment, storage, and disposal of... hazardous wastes" and authorizing "the development, implementation, and enforcement of a comprehensive state hazardous waste control program." Id. We find this clear expression of legislative policy adequate to support a delegation to DEQ of authority to promulgate rules and regulations necessary for the administration and enforcement of that policy.
Our next inquiry under the Schwegmann test is whether the HWCL prescribes sufficient standards to guide DEQ in the execution of the statute's declared policy. In testing the constitutional sufficiency of the standards prescribed in the HWCL, regard must be given to the purpose and scope of the act, the subject matters covered therein, the duties prescribed, and the broad or narrow powers granted. Adams, 458 So.2d at 1299; Union Tank Car, 439 So.2d at 381 (citing Bortz Coal Co. v. Air Pollution Commission, 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971)). The standards need not necessarily be set forth in express terms if they might reasonably be inferred from the statutory scheme as a whole. Id. at 383 (citing State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (1971)). Also, we must remember that an act of the legislature is presumed to be legal until it is shown to be unconstitutional, State v. Griffin, 495 So.2d 1306, 1308 (La.1986); Union Tank Car, 439 So.2d at 382, and that in construing statutes courts must endeavor to give an interpretation that will give the statutes effectiveness and purpose rather than one which renders them meaningless. Union Tank Car, 439 So.2d at 382; Johnson v. Sewerage Dist. No. 2 of Caddo Parish, 239 La. 840, 857, 120 So.2d 262, 268 (1960). Likewise, courts will not impute meanings which will lead to absurd results or extend statutes to situations which the legislature never intended should be covered thereby. Union Tank Car, 439 So.2d at 383; Smith v. Town of Vinton, 209 La. 587, 592, 25 So.2d 237, 239 (1946).
Furthermore, in State v. Union Tank Car Co., 439 So.2d 377, 382 (La.1983), we recognized that the judicial approval accorded the legislative practice of conferring ministerial powers upon administrative agencies is a product of the complex economic and social problems modern legislation must address, especially in a field as complex and diverse as that of environmental law. We stated:

*717 Because statutes directed at the control of air pollution are intended to encompass infinitely variable environmental conditions, flexibility and adaptability are required in meeting factual situations which could not possibly be foreseen by the legislature. State v. Braun, 378 A.2d 640 (Del. 1977). Thus, we are satisfied that statutes in the area of environmental law need not address each and every factual situation in which air pollution might be involved. Instead it is sufficient if the statutes be general in nature but at the same time retain standards of sufficient clarity to put a violator on notice.
Id. Of course, implicit in the constitutional prohibition against delegations of legislative power is the requirement that the standards which must accompany delegations must not be unlimited, unreasonable, or permit arbitrary action by the administrative body. Id. at 380; Rodriguez, 379 So.2d at 1086.
Applying the foregoing principles in our analysis of the HWCL, we find the statute when construed as a whole prescribes sufficient standards to guide DEQ's administration and enforcement of the legislative will. In accordance with the HWCL's declared policy and purpose, the HWCL authorizes DEQ to promulgate regulations implementing a comprehensive state hazardous waste control program consistent with "the minimum criteria hereinafter set forth" and also "consistent with the mandates" of the federal Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6901 et seq.[14] La.R.S. 30:2175. The requirement that the state hazardous waste control program be "consistent with the mandates" of RCRA is significant because RCRA authorizes States to administer and enforce hazardous waste programs "in lieu of the Federal program" so long as the state program is "equivalent to the Federal program," is "consistent with the Federal or State programs applicable in other States," and provides "adequate enforcement of compliance with the requirements of this subchapter," 42 U.S.C. § 6926(b), and so long as the State imposes no "requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations," although a state may impose more stringent requirements. 42 U.S.C. § 6929.[15] Hence, because RCRA imposes minimum requirements on states desiring to implement state hazardous waste control programs, the HWCL necessarily incorporates those minimum requirements into the entire state hazardous waste control regulatory scheme. The minimum requirements of RCRA therefore operate in the HWCL as standards which limit DEQ's discretion in executing the legislative will.[16]
*718 The HWCL then authorizes DEQ to "develop, consistent with federal regulations, objective criteria for identifying characteristics of hazardous wastes and for listing the hazardous wastes which shall be subject to the provisions of this Chapter," La.R.S. 30:2186(A), and defines hazardous waste as
any waste, or combination of wastes, which because of its quantity, concentration, physical, or chemical characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed. Such definition shall be applied only to those wastes identified and designated as such by the department, consistent with applicable federal laws and regulations.
La.R.S. 30:2173(2). In other words, DEQ may declare a substance a hazardous waste only in accordance with "objective criteria" and "consistent with the mandates" of RCRA and federal regulations. La.R.S. 30:2186(A); La.R.S. 30:2175. Moreover, pursuant to the HWCL's definition of hazardous waste the substance must be one which "may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness, or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed." La.R.S. 30:2173(2). Certainly such standards when fairly construed do not allow DEQ to exercise arbitrary discretion in identifying and designating a substance as a hazardous waste.
Additionally, the HWCL authorizes DEQ to issue, continue in effect, revoke, modify, and deny licenses, permits, schedules of compliance, and performance guidelines in accordance with regulations, La.R.S. 30:2180(A)(2) and (4), and prescribes detailed standards to guide DEQ in promulgating such regulations applicable to hazardous waste generators, La.R.S. 30:2188, transporters, La.R.S. 30:2189, and owners and operators of hazardous waste treatment, storage, and disposal facilities, La.R.S. 30:2192. For instance, the HWCL directs DEQ to promulgate regulations applicable to generators of hazardous waste "as may be necessary to protect public health and the environment" and which "at a minimum" include requirements for record keeping, labeling and use of containers, furnishing of information on the chemical composition of hazardous wastes, use of a manifest system, and identification of generators of hazardous wastes. La.R.S. 30:2188(A). The act further directs DEQ to "more fully set forth in regulations" the methods of disposal of hazardous wastes by generators and limits such methods to reprocessing and reuse of such wastes, disposal at the generator's own or at another's private site operated under a valid permit, contracting with a licensed private transporter, and disposal at a public site operated under a valid permit. La.R.S. 30:2188(B). Confronted with such particularized guidelines, we cannot say the *719 HWCL surrenders legislative power to DEQ's unfettered discretion.[17]
Furthermore, in addition to the explicit standards imposed upon DEQ by the legislature in the HWCL, we recognized in Save Ourselves v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1156 (La. 1984), that the Natural Resources article of the Louisiana Constitution[18] incorporates the public trust doctrine and "imposes a duty of environmental protection on all state agencies and officials, establishes a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy." We explained:
The Constitutional standard requires environmental protection "insofar as possible and consistent with the health, safety, and welfare of the people." La. Const. art. IX § 1. This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.
Id. at 1156-57. Construing a provision of the HWCL directing the former Environmental Control Commission[19] to promulgate design, construction, and operational standards for hazardous waste treatment, storage, and disposal facilities "which will assure safe treatment, storage, and disposal [of hazardous wastes] without substantial risk to the environment...," La.R.S. 30:2192 (formerly La. R.S. 30:1141), we concluded that although it was possible to construe the provision as setting forth a higher standard of protection, "the legislative aim merely was to implement and perpetuate the constitutional rule of reasonableness." Save Ourselves, 452 So.2d at 1157; see also In re American Waste & Pollution Control Co., 588 So.2d 367, 372 (La.1991). This "constitutional rule of reasonableness" therefore further serves to guide DEQ's execution of the legislative will as expressed in the HWCL.
Viewing at last the HWCL's criminal provisions in light of the act as a whole, it becomes clear the HWCL retains "standards of sufficient clarity to put a violator on notice." Union Tank Car, 439 So.2d at 382. The HWCL declares it unlawful "to initiate or continue the generation, transportation, treatment, storage, or disposal of hazardous wastes ... except in compliance with the notice requirements" of La.R.S. 30:2183(A) and DEQ regulations, La.R.S. 30:2183(B), and unlawful "to transport, treat, store, or dispose of hazardous wastes except in accordance with the terms and conditions" of a valid DEQ license, permit, schedule of compliance, or performance guidelines "and the regulations applicable thereto," La.R.S. 30:2183(E).[20] In this case the trial court, finding defendants Hampton and All Pro knowingly violated each of the foregoing provisions in such a manner that they knew or should have known they thereby placed another person in imminent danger of death or serious bodily injury, convicted defendants under La.R.S. 30:2183(G)(2), which provides:
Any person who knowingly transports, treats, stores, disposes of, or exports any substance in contravention of any provisions *720 of this Chapter or the regulations or of any permit or license terms and conditions adopted in pursuance thereof, or any person who otherwise knowingly violates any provisions of this Chapter, in such manner that he knows, or should have known, at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than two hundred fifty thousand dollars per day of violation and costs of prosecution, or imprisonment at hard labor for not more than fifteen years, or both.
Here it becomes apparent that the wealth of standards set forth in the HWCL as a whole serves not only to guide DEQ in promulgating regulations in accordance with the legislative will, but also to ensure thereby that the legislature, not DEQ, defines the crime punishable under La.R.S. 30:2183(G)(2). Under the circumstances of this case, the HWCL properly delegates to DEQ only administrative or ministerial authority to identify and designate those substances constituting hazardous wastes to which La.R.S. 30:2183(G)(2) is to be applied. As this court stated in State v. Guidry, 142 La. 422, 431, 76 So. 843, 846 (1917), "To ascertain and determine such facts is not a legislative function." Additionally, we find it significant that in La.R.S. 30:2183(G)(2) the legislature rather than DEQ prescribes the sanctions for the crime.
Thus, we find the HWCL as a whole, including the "constitutional rule of reasonableness" implemented therein, Save Ourselves, 452 So.2d at 1157, prescribes sufficient standards to guide DEQ's exercise of discretion in carrying out each phase of the development, implementation, and enforcement of the State's comprehensive hazardous waste control program, including the identification and description of substances constituting hazardous wastes.
In our third and final inquiry under the Schwegmann three-prong test, we find the HWCL is accompanied by adequate procedural safeguards to protect against abuse of discretion by DEQ. First, the HWCL requires DEQ to promulgate regulations "after public hearing thereon in accordance with the Administrative Procedure Act" (APA), La.R.S. 49:950-970. La.R.S. 30:2175; see also La.R.S. 30:2018(A) ("The procedure for the adoption, amendment, or repeal of any rule or regulation shall be in accordance with the Administrative Procedure Act"). The APA prescribes detailed procedures which administrative agencies must follow in adopting, amending, or repealing any regulation, including provisions for public notice and comment, La.R.S. 49:953, and publication and distribution. La.R.S. 49:954.1.
Perhaps more importantly for purposes of ensuring the agency exercises its discretion in accordance with the policy and standards embodied in the enabling statute, the APA provides for judicial review of the validity or applicability of rules "in an action for declaratory judgment in the district court of the parish in which the agency is located." La. R.S. 49:963(A)(1). "The court shall declare the rule invalid or inapplicable if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without substantial compliance with required rulemaking procedures." La.R.S. 49:963(C). Judicial review thus provides a remedy where a regulation fails to implement faithfully the legislative will.
Additionally, the HWCL prescribes procedures for legislative review of rules and regulations by standing committees of the House and Senate, subject, however, to executive veto of committee objections. La.R.S. 30:2180(A)(1).
In sum, consistent with the principles set forth in Schwegmann and inherent in the constitutional separation of powers, the HWCL contains a clear expression of legislative policy, prescribes sufficient standards to guide DEQ's administration and enforcement of that policy, and is accompanied by adequate procedural safeguards to protect against abuse of discretion by DEQ. We therefore hold La.R.S. 30:2183(G)(2), under which defendants Hampton and All Pro were convicted, does not unconstitutionally delegate to DEQ legislative authority to define a felony, but properly delegates only administrative or ministerial authority to ascertain and determine the facts upon which the law is to be applied and enforced.

*721 DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed, the judgment of the trial court is reinstated, and defendants' convictions and sentences are affirmed.
REVERSED.
NOTES
[*] Hall, J., not on panel. See La.S.Ct.Rule IV, Part II, § 3.

Judge Charles A. Marvin, Chief Judge, Court of Appeal, Second Circuit, sitting in place of Justice James L. Dennis.
[1] "[A] case shall be appealable to the supreme court if (1) a law or ordinance has been declared unconstitutional...." La. Const. art. V, § 5(D).
[2] The HWCL authorizes DEQ to "develop, consistent with federal regulations, objective criteria for identifying characteristics of hazardous wastes and for listing the hazardous wastes which shall be subject to the provisions of this Chapter." La.R.S. 30:2186(A).
[3] La.R.S. 30:2183(G)(1) and (3) provide additional criminal penalties as follows:

(1) Any person who willfully or knowingly discharges, emits, or disposes of any substance in contravention of any provision of this Chapter or any regulations or of any permit or license terms and conditions adopted in pursuance thereof, or any person who otherwise knowingly violates any provision of this Chapter, shall, upon conviction be subject to a fine of not more than one hundred thousand dollars per day of violation and costs of prosecution, or imprisonment at hard labor for not more than ten years, or both.
. . . .
(3) Any person who knowingly omits any material information or knowingly and intentionally makes any false statement, representation, or certification in any application, record, label, manifest, report, plan, or other document filed or required to be maintained under this Chapter, or under any permit, rule, or regulation issued under this Chapter, or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method to be maintained under this Chapter, or under any permit, rule, or regulation issued under this Chapter, shall upon conviction be punished by a fine of not more than twenty-five thousand dollars or imprisonment for not more than six months, or both.
[4] Judge Foil dissented and assigned reasons.
[5] The Louisiana Criminal Code defines the term crime as "that conduct which is defined as criminal in this Code, or in other acts of the legislature, or in the constitution of this state." La.R.S. 14:7. See State v. Gyles, 313 So.2d 799, 801 (La.1975).
[6] Compare Justice Scalia's dissent in Mistretta v. United States, 488 U.S. 361, 417-19, 109 S.Ct. 647, 678-79, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting):

The whole theory of lawful congressional "delegation" is not that Congress is sometimes too busy or too divided and can therefore assign its responsibility of making law to someone else; but rather that a certain degree of discretion, and thus of law-making, inheres in most executive or judicial action, and it is up to Congress, by the relative specificity or generality of its statutory commands, to determineup to a pointhow small or how large that degree shall be.
. . . .
The focus of controversy, in the long line of our so-called excessive delegation cases, has been whether the degree of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to amount to a delegation of legislative powers. I say "so-called excessive delegation" because although that convenient terminology is often used, what is really at issue is whether there has been any delegation of legislative power, which occurs (rarely) when Congress authorizes the exercise of executive or judicial power without adequate standards. Strictly speaking, there is no acceptable delegation of legislative power.
[7] In State v. Broom, 439 So.2d 357, 366-67 and nn. 5-6 (La.1983), we pointed out that each of the constitutions of Louisiana from 1812 to the present, with the exception of the Constitution of 1868, specifically confines the powers of each of the three departments of government. We then noted:

The 1812 Louisiana Constitution was modeled on the Constitution of Kentucky. See 9 Tul.L.Rev. 244 at 245. Thomas Jefferson was the author of Art. I of the 1812 Louisiana Constitution. Both Jefferson and George Washington expressed concern about consolidation of the separate departments. "The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism." Saint v. Allen, [169 La. 1046] 126 So. at 554, 126 So. 548, quoting Washington's Farewell Address.
Id. at 367 n. 7.
[8] See Panama Refining Co. v. Ryan, 293 U.S. 388, 440, 55 S.Ct. 241, 256, 79 L.Ed. 446 (1935) (Cardozo, J., dissenting) (finding the declared policy and structure of a section of the National Industrial Recovery Act (NIRA) provided standards sufficient to support a delegation to the President because the delegated discretion was "canalized within banks that ke[pt] it from overflowing"); A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 553, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring) (finding a different section of the NIRA completely transferred Congress's power under the Commerce Clause resulting in "delegation running riot"); see also Industrial Union Dept., AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 675, 100 S.Ct. 2844, 2881, 65 L.Ed.2d 1010 (1980) (Rehnquist, J., concurring) (discussing "uncanalized delegations of legislative power").
[9] See generally Alfred C. Aman, Jr. & William T. Mayton, Administrative Law §§ 1.1-1.4 (1993); David Schoenbrod, The Delegation Doctrine: Could the Court Give It Substance?, 83 Mich. L.Rev. 1223 (1985).
[10] The court of appeal also relied heavily on H. Alston Johnson, Developments in the Law, 1983-84: LegislationProcedure and Interpretation, 45 La.L.Rev. 341 (1984), in which Mr. Johnson comments: "If the power in question is one that directly affects the liberties of individual citizens, it is likely that there will be, and should be, little or no delegation of authority to regulatory agencies." Id. at 355.
[11] See discussion of Administrative Procedure Act infra.
[12] In an amicus curiae brief, the Attorney General for the State of Louisiana points out that all fifty states and the federal government have enacted environmental statutes authorizing administrative agencies to identify and designate which substances constitute hazardous wastes, and further that all fifty states and the federal government have enacted statutes providing criminal penalties for certain violations of hazardous waste statutes and regulations.
[13] Cf. People v. Martin, 211 Cal.App.3d 699, 259 Cal.Rptr. 770 (1989) (upholding a similar criminal penalty provision in California's Hazardous Waste Control Act against a challenge on grounds of unconstitutional delegation of legislative authority).
[14] RCRA regulates the generation, transportation, storage, treatment, and disposal of solid waste, including hazardous waste. The Act authorizes the Environmental Protection Agency (EPA) to "develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste," 42 U.S.C. § 6921(a), and to promulgate regulations establishing standards applicable to generators and transporters of hazardous waste as well as standards and permit requirements applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities. 42 U.S.C. §§ 6922-6925. RCRA also establishes criminal penalties for "knowing" violations of the Act's provisions or of EPA regulations or permits. 42 U.S.C. § 6928.
[15] An announced congressional purpose in establishing federal minimum standards governing generation, transportation and disposal of hazardous waste was to provide uniformity among the states in the field of hazardous waste disposal regulation. See H.R.Rep. No. 94-1491, 94th Cong., 2d Sess. at p. 30, reprinted in [1976] U.S.Code Cong. & Admin.News, pp. 6238, 6268; Rollins Environ. Serv. v. Iberville Parish, 371 So.2d 1127, 1132-33 (La.1979).
[16] We find the HWCL's incorporation of the minimum requirements of RCRA distinguishable from the situation in State v. Rodriguez, 379 So.2d 1084 (La.1980), where we found an unconstitutional delegation of legislative authority in a statute which directed the secretary of the Department of Health and Human Resources (DHHR) to add a substance to the Louisiana list of controlled dangerous substances "if it is classified as a controlled dangerous substance by the Drug Enforcement Administration of the United States Government." La.R.S. 40:962(B). Finding "no standards or criteria to guide the secretary, who merely adds to the contraband list the substances found dangerous by the federal agency," we concluded the delegations resulted in "a surrender of legislative power." Rodriguez, 379 So.2d at 1087. "The Louisiana legislature is not authorized to delegate its legislative power to a federal agency, nor to Congress," we stated. "Even though the Drug Enforcement Administration is governed by such congressional standards, Louisiana cannot delegate to it the power to make the possession of certain drugs a crime." Id.

In the present case, the HWCL directs DEQ to promulgate regulations "consistent with the mandates" of RCRA. La.R.S. 30:2175. Unlike the "surrender of legislative power" in Rodriguez, however, in the HWCL the legislature retains its legislative power to determine what the law shall be "in lieu of the Federal program," 42 U.S.C. § 6926(b), and it exercises that power to the full extent authorized by RCRA. Thus, the legislature, not Congress or EPA, establishes the "framework for the regulation, monitoring, and control of the generators, transportation, treatment, storage, and disposal of such hazardous wastes" in Louisiana. La.R.S. 30:2172(B). Furthermore, although the legislature necessarily incorporates RCRA's minimum requirements in the HWCL as standards which serve to limit DEQ's discretion in administering and enforcing the HWCL, the legislature does not thereby surrender either to Congress, EPA, or DEQ its power to impose requirements which are more stringent than RCRA's requirements. See 42 U.S.C. § 6926; see also La.R.S. 49:953(F) (prescribing special procedures for promulgation by DEQ of "a rule that is not identical to a federal law or regulation or is not required for compliance with a federal law or regulation"). In the statute under scrutiny in Rodriguez, in contrast, the legislature completely deferred to the findings of the federal agency and directed the secretary of DHHR to do likewise.
[17] Cf. Broom, 439 So.2d at 366, in which the sole standards set forth in La.R.S. 40:1471.9 were that the regulations be "reasonably necessary for the protection of the health, welfare and safety of the public" and in conformity with "the published rules and standards of the Institute of Makers of Explosives." See supra text accompanying note 11.
[18] The Natural Resources article, La. Const. art. IX, § 1, provides:

The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
[19] Pursuant to Act 795 of 1984, effective July 13, 1984, all powers and duties of the Environmental Control Commission were transferred to and became vested in the secretary of DEQ. La.R.S. 30:2013.
[20] See supra text accompanying note 3 for statutory definitions of disposal, storage, and transportation. La.R.S. 30:2173(1), (4), and (6).