711 So.2d 675 (1998)
PROGRESSIVE SECURITY INSURANCE COMPANY
v.
Honorable Murphy J. FOSTER, in his capacity as Governor of Louisiana, Honorable James H. "Jim" Brown, in his capacity as Commissioner of Insurance, and the Louisiana Insurance Rating Commission, through its Chairman, James H. "Jim" Brown.
LAFAC, INC.
v.
Honorable Richard J. IEYOUB, in his capacity as Louisiana Attorney General, Honorable Murphy J. Foster, in his capacity as Governor of Louisiana, Honorable James H. "Jim" Brown, in his capacity as Commissioner of Insurance, and the Louisiana Insurance Rating Commission, through its Chairman, James H. "Jim" Brown,
National Association of Independent Insurers, Intervenor.
No. 97-CD-2985.
Supreme Court of Louisiana.
April 23, 1998.
*678 Lewis O. Unglesby, Aidan C. Reynolds, Unglesby Cheney C. Joseph, Jr., Kimberly Wooten, James H. Brown, Patricia T. Riddick, James Hrdlicka, Keith D. Jones, R. Vaughn Cimini, Cimini & Associates, Metairie; Donald T. W. Phelps, Brace B. Godfrey, Jr., Baton Rouge, for Applicants.
H. Alston Johnson, III, Phelps Dunbar, L.L.P., Baton Rouge, for Intervenor.
Wayne J. Lee, John P. Cerise, Anne V. Winter, New Orleans, for State Farm Auto Insurance, Amicus Curiae.
KNOLL, Justice.[1]
Progressive Security Insurance Company and LAFAC, Inc. separately petitioned for declaratory judgment against the Governor, the Attorney General,[2] the Commissioner of Insurance, and the Louisiana Insurance Rating Commission (LIRC), challenging the constitutionality of the Omnibus Premium Reduction Act of 1997 (Act 1476), known as the "no pay, no play" statute. The National Association of Independent Insurers (NAII), a representative of 560 property and casualty insurers, intervened, taking neither side in these proceedings. After consolidation of the cases, the district court rendered judgment, finding that Act 1476 did not violate any provision of the United States or Louisiana Constitutions. Although the plaintiffs filed a motion for an appeal to the Court of Appeal, First Circuit, on joint motion of all parties supervisory writs were filed with this court, seeking review of the trial court ruling. Exercising our supervisory jurisdiction under La. Const. Art. V, Section 5(A), we granted the joint application for supervisory writs of certiorari to consider the constitutionality of the trial court's ruling. No. 97-CD-2985 (La.12/10/97), 704 So.2d 1177.[3]

*679 FACTS AND PROCEDURAL HISTORY
In 1996, Governor Murphy J. Foster appointed the Louisiana Task Force for Reduction of Automobile Insurance Rates (Task Force) which was staffed by the LIRC. Pursuant to its mandate, the Task Force appointed the Actuarial Subcommittee to analyze the cost of various automobile insurance reform proposals generated from the Task Force. The Actuarial Subcommittee was comprised of the Chairman of the Department of Insurance, together with representatives from CNA Insurance Companies, Allstate Insurance Companies, State Farm Insurance Companies, Louisiana Farm Bureau Insurance Companies, and LAFAC.
Operating with a deadline of March 5, 1997, the Task Force instructed the Actuarial Subcommittee to review the various proposals submitted, select and prioritize the five proposals which provided the greatest estimated actuarial savings, and issue a report on its findings. Although the Task Force referred approximately 43 proposals to the subcommittee for actuarial assessment, the Actuarial Subcommittee analyzed ten proposals. "No pay, no play" was one of the proposals analyzed and was legislatively implemented in Act 1476, the Omnibus Premium Reduction Act of 1997.
Two provisions of Act 1476 are pertinent herein. The first is La.R.S. 32:866, a newly enacted statute, which provides, in pertinent part:
(A)(1) There shall be no recovery for the first ten thousand dollars of bodily injury and no recovery for the first ten thousand dollars of property damage based on any cause or right of action arising out of a motor vehicle accident, for such injury or damages occasioned by an owner or operator of a motor vehicle involved in such accident who fails to own or maintain compulsory motor vehicle liability security.
It is this proviso which has been dubbed as "no pay, no play." Succinctly stated, if a motorist fails to pay for liability coverage to protect others, he cannot "play" in the legal system, at least to the collection of his first $10,000 damages.[4]
The second aspect of Act 1476 that is relative to the constitutional challenge before us involves the 10% rate reduction found in Section 5(A) which states:
Every motor vehicle insurer authorized to transact business in the state of Louisiana shall make an automobile policy rate filing with the Louisiana Insurance Rating Commission to reduce its combined rates for bodily injury liability and property damage liability by a minimum of ten percent in each of its respective territorial service areas, based upon the average rate in such area on the day prior to "rate reduction day", unless the motor vehicle insurer can demonstrate at a rate hearing that such a decrease will result in inadequate rates, or would result in the continuation of inadequate existing rates, for the motor vehicle insurer in accordance with R.S. 22:1404 or the provisions of Section 7(B) of this Act become applicable.
We observe that two groupings emerge which are affected by the legislation challenged in plaintiffs' petition. Through La. R.S. 32:866(A) the rights of persons who do not have liability insurance, the uninsured, are affected. Likewise, by virtue of Section 5 of Act 1476 insurers who provide automobile liability insurance in Louisiana are mandated to file a plan to reduce the rates they charge their customers.
The two plaintiffs we have before us are Progressive, a domestic insurance company which issues casualty insurance, including automobile liability coverage, and LAFAC, a trade association of domestic insurers.[5] In *680 their petition for declaratory judgment, these plaintiffs contended in the trial court that Act 1476 was unconstitutional for the following reasons: (1) the language used in the Act is unconstitutionally vague; (2) the Act inflicts cruel and unusual punishment; (3) the Act violates equal protection of the laws; (4) the Act violates separation of powers; (5) the Act provides for the taking of property without due process; (6) the Act denies access to the Courts; (7) the Act impairs obligations of contracts; and (8) the Act impairs subrogation rights.
The NAII, a non-profit property and casualty insurance trade commission, intervened for the purpose of urging a judicial determination of the constitutionality of Act 1476. In its petition, NAII emphasized that the legislature crafted a declaratory action into Act 1476 which was specially designed to test the constitutionality of the Act and to expeditiously resolve such challenge.[6]
Keeping in mind the need for a uniform pronouncement on the constitutionality of Act 1476, the trial court consolidated these cases for hearing on October 28, 1997. After conducting an evidentiary hearing, the trial court upheld the constitutionality of Act 1476 and signed a judgment to that effect on November 4, 1997. To definitively address the merits of the litigation, we granted the joint writ application of all parties to this litigation, and agreed to consider the constitutional issues raised.
In their argument before us, Progressive and LAFAC have honed their contentions down to five constitutional challenges. Plaintiffs contend that Act 1476: (1) excessively punishes an uninsured motorist; (2) effectively allows the legislature to set insurance premium rates; (3) is impermissibly vague, impairs the rights of subrogation, and fails to provide adequate notice of the depth of the statute; (4) violates the equal protection clauses of the United States and Louisiana constitutions; and (5) denies access to the courts, and constitutes a taking without due process.[7]

EXCESSIVE PUNISHMENT
Progressive and LAFAC argue that Act 1476 excessively punishes an uninsured motorist. They point out that La.R.S. 32:863, 864, and 865 already exist which exact punishment for failing to obtain auto liability insurance. In addition to these penalties, which include suspensions, revocation of license, fines, and community service, the plaintiffs assert that Act 1476 unnecessarily expands the punishments by barring the recovery of the first $10,000 of property damage *681 or bodily injury regardless of fault. As such, it is argued that the punishment which La.R.S. 32:866 metes out is excessive, cruel and unusual as contemplated by La. Const. Art. I, § 20. We disagree.
Louisiana's requirement for compulsory automobile liability insurance is sketched out in La.R.S. 32:861(A)(1) and La. R.S. 32:900. La. R.S. 32:861(A)(1) provides:
Every self-propelled motor vehicle registered in this state except those motor vehicles used as agricultural or forest vehicles during seasons when they are not used on the highway, those used primarily for exhibit or kept primarily for use in parades, exhibits, or shows, and lease-bound mobile rig haulers as defined in Subsection D of this Section, shall be covered by an automobile liability policy with liability limits as defined by R.S. 32:900(B)(2) or 900(M), or a binder for same, or by a motor vehicle liability bond as defined by Subsection B of this Section, or by a certificate of the state treasurer stating that cash or securities have been deposited with said treasurer as provided by Subsection C of this Section, or by a certificate of self-insurance as provided by R.S. 32:1042.
La. R.S. 32:900 provides in pertinent part:
(A) A "Motor Vehicle Liability Policy" as said term is used in this Chapter, shall mean an owner's or an operator's policy of liability insurance, certified as provided in R.S. 32:898 or 32:899 as proof of financial responsibility, and issued except as otherwise provided in R.S. 32:899, by an insurance carrier duly authorized to transact business in this state, to or for the benefit of the person named therein as insured.
(B) Such owner's policy of liability insurance:
(1) Shall designate by explicit description or by appropriate reference all motor vehicles with respect to which coverage is thereby to be granted; and
(2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of such motor vehicle or motor vehicles within the United States of America or the Dominion of Canada, subject to limits exclusive of interest and costs with respect to each such motor vehicle as follows:
(A) Ten thousand dollars because of bodily injury to or death of one person in any one accident, and,
(B) Subject to said limit for one person, twenty thousand dollars because of bodily injury to or death of two or more persons in any one accident, and
(C) Ten thousand dollars because of bodily injury to or destruction of property of others in any one accident.
If an owner fails to comply with Louisiana's compulsory automobile liability insurance law, the registration of the vehicle shall be revoked and the vehicle's license plate shall be impounded or canceled. La.R.S. 32:863(A)(1). Additionally, if a person provides false information about his compliance with Louisiana's compulsory automobile liability insurance law, he shall be guilty of a misdemeanor, subject to a fine on not more than $125 or imprisonment of no more than 30 days. La.R.S. 32:864. Likewise, if a person knowingly operates a vehicle without liability insurance, he is subject to a fine of not more than $500. La.R.S. 32:865(A). And, if an uninsured vehicle is involved in an accident in Louisiana, the owner may be fined not more than $500, shall have the registration revoked for a 60-day period, and shall have his driving privileges suspended for 60 days. La.R.S. 32:865(B). Now, with the enactment of La.R.S. 32:866, delineated supra, the uninsured motorist is barred from recovering the first $10,000 of property damage and/or bodily injury regardless of fault.
La. Const. Art. I, § 20 provides that "[n]o law shall subject any person to ... cruel, excessive, or unusual punishment."
In framing the question before us, Progressive and LAFAC, analogizing our state's criminal law and jurisprudence, assert that the partial bar of recovery in La.R.S. 32:866 *682 constitutes a punishment.[8] Thus, the first question we must determine is whether the partial bar of recovery is a punishment under our system of law. For reasons enunciated below, we do not find that the barred recovery of the first $10,000 as provided in La.R.S. 32:866 constitutes punishment.
It is firmly established that the right to drive a motor vehicle in Louisiana is a privilege granted by the State and not a constitutional right. Spencer v. State Dept. Of Public Safety, 315 So.2d 912 (La.App. 4 Cir.1975); Harrison v. State Dept. Of Public Safety, 298 So.2d 312 (La.App. 4 Cir.), writ denied, 300 So.2d 840 (La.1974). As such, the State has enacted numerous conditions on that privilege.[9] In the present case, the partial recovery bar delineated in La.R.S. 32:866 is just such a condition imposed on the "owner or operator of a motor vehicle involved in such an accident who fails to own or maintain compulsory motor vehicle liability security."
It is of no moment that an owner or operator may also be subject to the criminal provisions recognized in La.R.S. 32:864 and 865. The partial recovery bar enunciated in La. R.S. 32:866 is a separate administrative corollary to the statutes which establish the driving privilege and is unrelated to the potential criminal conduct which may arise from the same factual scenario. See Harrison, 298 So.2d at 318; Whitaker v. State, Dept. of Pub. Safety, 264 So.2d 725 (La.App. 1 Cir.), writ denied, 262 La. 1167, 266 So.2d 447 (1972).[10]
Furthermore, we find that the reliance of Progressive and LAFAC on Austin v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), is misplaced. In Austin, the Supreme Court held that forfeiture of a mobile home and a body shop to the government under 21 U.S.C. §§ 881(a)(4) and (a)(7) constituted a monetary punishment which violated the Excessive Fines Clause of the Eighth Amendment of the United States Constitution.[11] As found in Austin, "[t]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, `as punishment for some offense.'" Id., 509 U.S. at 609, 113 S.Ct. at 2805 (quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 265, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989)). In the present case, unlike the forfeiture of property to the government depicted in Austin, La.R.S. 32:866 does not involve any payment by the uninsured owner or operator to the government; as a point of fact, the insured citizens and the insurers of the state, not the government, are the beneficiaries of the projected benefits from Act 1476.[12]

*683 UNCONSTITUTIONAL EXERCISE OF LEGISLATIVE POWER
Progressive and LAFAC also contend that by specifying a minimum 10% reduction in premium rates, the legislature has impermissibly exercised the powers granted the Louisiana Commissioner of Insurance in La. Const. Art. IV, § 11 and those provided to the Louisiana Insurance Rating Commission in La.R.S. 22:1401.
La. Const. Art. IV, § 11 provides:
There shall be a Department of Insurance, headed by the commissioner of insurance. The department shall exercise such functions and the commissions shall have powers and perform duties authorized by this constitution or provided by law.
La.R.S. 22:1401, inter alia, creates the LIRC, establishes its membership, designates that the commissioner of insurance shall serve as ex officio chairman of the commission, and authorizes the LIRC to regulate rates of insurance companies doing business in the state. Elaborating on the purpose of the LIRC, La.R.S. 22:1402 provides:
The purpose of this Part is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory, and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this Part. Nothing in this Part is intended (1) to prohibit or discourage reasonable competition, or (2) to prohibit or encourage, except to the extent necessary to accomplish the aforementioned purpose, uniformity in insurance rates, rating systems, rating plans or practices. This Part shall be liberally interpreted to carry into effect the provisions of this Section.
It is well established that none of the three branches of government shall exercise the power which belongs to either of the others. La. Const. Art. II, § 2. Notwithstanding, in State v. All Pro Paint & Body Shop, Inc., 93-1316 (La.7/5/94), 639 So.2d 707, we stated:
[W]here an enabling statute expresses a clear legislative policy and contains sufficient standards for the guidance of the administrative official empowered to execute the legislative will, the legislature may delegate to an administrative agency the administrative or ministerial authority to ascertain and determine the facts upon which the law is to be applied and enforced.
Id., 639 So.2d at 711-12.
A close reading of Section 5(A) of Act 1476 shows that the Louisiana legislature did not restrict LIRC's authority to finally determine the insurance rates for this state's citizens. Rather, in light of what was hoped to be accomplished through the enactment of "no pay, no play" legislation, particularly in view of the actuarial assessment provided by the Actuarial Subcommittee, it is clear that Act 1476 set standards of assessment which insurers were asked to apply in proceedings to be held before the LIRC.[13] Accordingly, it is clear that the Commissioner of Insurance was intimately involved in the formulation of the recommendations that later became the legislation and that the LIRC remains the ultimate arbiter of rates.[14] Therefore, we do not find that Progressive and LAFAC's argument has merit.

VAGUENESS
Progressive and LAFAC next contend that the inclusion of the term "occasioned by" in La.R.S. 32:866 makes the statute impermissibly vague, impairs the rights of subrogation, and gives inadequate notice of the depth of the statute.[15] They argue *684 that "occasioned by" can mean either "suffered by" or "caused by;" if it is read to mean "caused by," the statute is fatally flawed.
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La.Civ.Code art. 9. When the language of a law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examination of the context in which they occur and the text of the law as a whole. Louisiana Smoked Products, Inc. v. Savoie's Sausage and Food Products, Inc., 96-1716 (La.7/1/97), 696 So.2d 1373; Hutchinson v. Patel, 93-2156 (La.5/23/94), 637 So.2d 415. See also, La.Civ. Code art. 10, "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law" and La.Civ.Code art. 12, "When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." Where a statute is ambiguous and susceptible of two constructions, the courts will give that construction which best comports with the principles of reason, justice, and convenience, for it is to be presumed that the legislature intended such exceptions to its language as would avoid its leading to injustice, oppression, or absurd consequences. Freechou v. Thomas W. Hooley, Inc., 383 So.2d 337 (La.1980).
Act 1476 provides that there shall be no recovery of the first $10,000 for persons
for such injury or damages occasioned by an owner or operator of a motor vehicle involved in such accident who fails to own or maintain compulsory motor vehicle liability security.
(Emphasis added).
In the present case, a respectable argument can be made that the term "occasioned by" can be read to mean "caused by." However, as explained below, after utilizing the rules of construction outlined above, it is clear that "occasioned by" means "suffered by."
In Section 1 of the Omnibus Premium Reduction Act of 1997 the legislature enunciated two broad purposes for the legislation: (1) "to reduce otherwise recoverable damages for failure to maintain liability insurance coverage" and (2) to "encourage all persons who own or operate motor vehicles on the public streets and highways of this state to comply with the Motor Vehicle Safety Responsibility Law." It is evident that if "occasioned by" was interpreted to mean "caused by," the legislative purpose would not be effected since such interpretation would only apply if an uninsured motorist caused the accident; thus, an uninsured motorist who did not cause an accident would not be affected by the present legislation. Clearly, based upon the unmistakable pronouncement of legislative purpose in Section 1, no such limitation was enunciated and such an interpretation was not intended. Moreover, since comparative fault has existed in this state for well over a decade, the interpretation advanced by plaintiffs would render Act 1476 meaningless because the fault of persons who cause accidents is already accounted for when their recovery is proportionally reduced. Such an interpretation would render Act 1476 superfluous, would result in no change in the current law, and would produce absurd consequences. As provided in the Civil Code and in well established jurisprudence, absurd interpretations of legislative enactments are impermissible. Freechou, supra.
Additionally, we find that a contextual analysis of Act 1476 shows that "occasioned by" means "suffered by." La.R.S. 32:866(B) provides:
Each person who is involved in an accident in which the other motor vehicle was not covered by compulsory motor vehicle liability security and who is found to be liable for damages to the owner or operator of the other motor vehicle may assert as an *685 affirmative defense the limitation of recovery provisions of Subsection A of this Section.
In this provision the legislature has provided an affirmative defense to the insured motorist who caused the accident to be available against the claim of the uninsured motorist. Thus, reading the statute as advanced by plaintiffs, since the uninsured motorist had not caused the accident, the reductional provision of La.R.S. 32:866(A) would not even be called into play. As evidenced by plaintiffs' reading of "occasioned by," such an interpretation would render this subparagraph nonsensical and lead to absurd consequences.
Likewise, La.R.S. 32:866(C) provides:
If the owner of a motor vehicle, who fails to own or maintain compulsory motor vehicle liability security, institutes an action to recover damages in any amount, regardless of whether such owner or operator is at fault, and is awarded an amount equal to or less than the minimum amount of compulsory motor vehicle liability security, then such owner or operator shall be assessed and held liable for all court costs incurred by all parties to the action.
In this provision the legislature has crafted a penalty assessable against the uninsured motorist, regardless of fault, if his damages are not proven to be greater than $10,000. If, as advanced by plaintiffs, the inability to collect the first $10,000 established in La.R.S. 32:866(A) does not come into play unless the fault of the uninsured motorist causes damages, then the legislature has crafted a penalty for a scenario that can never come into play. Again, plaintiffs' interpretation of the questioned phrase would render a portion of the statute meaningless.
In summation, reading the term "occasioned by" in light of the stated purpose of Act 1476 and within the context of related provisions within the statute, it is clear that "occasioned by" utilized in La.R.S. 32:866(A) can only mean "suffered by." To read the term any other way would render the legislative enactment meaningless and would lead to absurd consequences.
Progressive and LAFAC also contend that Act 1476 impliedly impairs subrogation rights. We disagree. To the extent that the legislature has restricted the uninsured's right of recovery of the first $10,000, there is no right to subrogation for the first $10,000 since no obligation to pay exists. As to damages in excess of the first $10,000, the right to subrogation continues unaffected by Act 1476.
Finally, Progressive and LAFAC question whether the bar to recovery in Act 1476 applies to the post-fault assessment phase of litigation. If it does, then they argue that an uninsured motorist is forced to guess at how a fact finder will assess fault among those found negligent. In this manner, they contend that the statute is vague to the extent that an uninsured motorist cannot foretell its impact.
In essence, the complaint of Progressive and LAFAC addresses the application of Act 1476 in the context of La.Civ.Code art. 2323, not its wording. Notice of the depth of the statute is clearly stated in the words used by the legislature: there shall be no recovery of the first $10,000 for the uninsured owner or operator (La.R.S.32:866(A)); if the uninsured owner of a motor vehicle institutes "an action to recover damages in any amount, regardless of whether such owner or operator is at fault, and is awarded an amount equal to or less than the minimum amount of compulsory motor vehicle liability security," then he shall be liable for all court costs (La. R.S.32:866(C)). As such, it is clear that the statute provides guidance to the uninsured motorist/owner of the implications of his failure to have liability insurance regardless of the issue of fault. Moreover, the plaintiffs misapply comparative fault. As provided in La.Civ.Code art. 2323, the amount of damages recoverable is first ascertained and then it is reduced "in proportion to the degree of percentage of negligence attributable." Thus, we find no merit to this contention in the context herein presented.

EQUAL PROTECTION/DUE PROCESS
Progressive and LAFAC next challenge Act 1476, urging violations under both the Louisiana and United States Constitutions. Since the guarantees of equal protection provided under the two constitutions differ, the *686 determination of whether governmental action violates either constitution requires separate analysis for each.
La. Const. Art. I, § 3 provides, in pertinent part:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations.
As noted by us in Soloco, Inc. v. Dupree, 97-CA-1256 (La.1/21/98), 707 So.2d 12,
La. Const. Art. I, § 3 provides for three levels of constitutional review or scrutiny. Laws which classify individuals based on race or religious beliefs are repudiated completely. An intermediate level of scrutiny is reserved for laws which classify persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliation. The lowest level of scrutiny applies to laws which classify persons on any basis other than those enumerated in La. Const. Art. I, § 3. Such laws need only be rationally related to a legitimate governmental purpose, and a person attacking the constitutionality of such a classification has the stringent burden of demonstrating that the law does not suitably further any appropriate state interest. See, Manuel [v. State, 95-CA-2189 (La.7/2/96), 692 So.2d 320]; Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96), 668 So.2d 1135; Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985).
Soloco, 707 So.2d at 15.
Therefore, under La. Const. Art. I, § 3, laws which classify persons on any basis other than those specifically enumerated therein are subject only to minimal scrutiny.
On the other hand, the Fourteenth Amendment to the United States Constitution, provides only the following regarding equal protection under state law: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." As revealed by the language employed, the Fourteenth Amendment does not specify which classifications receive particular levels of scrutiny nor does it explain how a particular level of scrutiny operates when it is applied. Instead, the levels of scrutiny have been provided through the development of jurisprudence in the United States Supreme Court. In general, strict scrutiny is applied to governmental action if a classification infringes on a fundamental or express constitutional right or if it discriminates on the basis of a "suspect" classification such as race. In such an instance, the law is presumed unconstitutional and will be struck down unless it is shown to be necessarily related to a compelling state interest. A classification that involves discrimination based on certain classes such as gender or illegitimacy will generally receive intermediate scrutiny. Under this level of review, to be upheld the classification must be substantially related to a legitimate state interest. The lowest level of review is applicable to any other classification and requires the challenging party to prove that the classification is not rationally related to any legitimate government interest. LAGC v. State Through Div. of Administration, 95-2105 at pp. 13-14 (La.3/8/96), 669 So.2d 1185, 1195-96.
In the present case, the plaintiffs argue that Act 1476 unconstitutionally classifies persons on the basis of whether or not they have automobile insurance. Since it is evident that this purported classification fails to implicate any of the traits or characteristics enumerated in La. Const. Art. I, § 3, it was incumbent upon the plaintiffs to show that there was a violation of that provision by establishing that the legislature's classification does not suitably further any appropriate state interest. In a like vein, because the statute's classification on the basis of a person's voluntary decision to remain uninsured does not infringe on a fundamental right or discriminate on the basis of a suspect classification such as race, alienage, or national origin, or on an intermediate scrutiny classification such as gender or illegitimacy, it was incumbent upon the plaintiffs to show that there was a violation of the Fourteenth Amendment of the United States Constitution[16] *687 by showing that the classification is not rationally related to any legitimate governmental interest.[17]
The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. Soloco, Inc., supra. Thus, in order for the plaintiffs to prevail it was incumbent upon them to demonstrate that Act 1476 does not "suitably further any appropriate state interest." Id.
Plaintiffs contend that Act 1476 is not reasonably related to a legitimate state interest. Their argument is threefold. First, if the Act was intended to punish uninsured motorist, it is discriminatory to punish uninsured motorists who are not at fault. Second, they argue that if the purpose of the legislation was to lower insurance rates, there is no evidence that there is a link between a person's status as uninsured and injuries/damages caused by an accident. Third, if the legislature intended to deter uninsured motorists from driving, no correlation has been shown between Act 1476 and that purpose.
We observe that even though it was noted that it has been the law in Louisiana since 1978 that every driver must be insured, estimates showed:
[B]ased on experience from urban/suburban Louisiana ... Louisiana's uninsured population [was] 13% ... An estimate based on Department of Motor Vehicles data suggests the uninsured population is 16%. Another costing based on experience from rural Louisiana determined the Louisiana uninsured population to be around 29%.
Louisiana Task Force for Reduction of Automobile Insurance RatesReport of the Actuarial Subcommittee, March 5, 1997, page 6.
Likewise, based upon the implementation of "no pay, no play" legislation, the Actuarial Subcommittee estimated from empirical data available to its members that cost savings would be realized between 4.3% and 10% on basic coverage and between 2.4% and 4.8% on insured who have full liability coverage insurance. Id.
In addition, in his report, Commission of Insurance James H. "Jim" Brown informed the legislature that twelve states have enacted legislation barring uninsured drivers involved in accidents, to some degree, from instituting lawsuits. In particular, the report referenced "no pay, no play" legislation in California which has resulted in a much higher compliance with that state's compulsory liability insurance law and a saving to California insurers of $327 million in annual claims. Reforming Automobile Insurance1997 A Special Report, pp. 8, 25-26.
In the present case, the legislature cogently and succinctly stated in Section 1 of Act 1476 that the legislation was enacted because of a concern for: (1) the lack of compliance with the Motor Vehicle Safety Responsibility Law; (2) the high incidence of motor vehicle accident claims in the state's courts; (3) reduction of the high cost of motor vehicle insurance through reformation of the civil justice system; (4) an evident imbalance in the state's motor vehicle insurance system which had engendered abuse *688 within the system; and, (5) the need for insurance cost savings to the citizens of the state through a reduction of premium rates for motor vehicle insurance.
After having reviewed the record compiled below, we find no evidence which shows that the "no pay, no play" provision of Act 1476 does not effectuate the state's concern in these matters. It is not the prerogative of the judiciary to disregard public policy decisions underlying legislation or to reweigh balances of interests and policy considerations already struck by the legislature. Soloco, Inc., supra. We find that the "no pay, no play" provisions of Act 1476 promote the state's interest in reducing the number of uninsured motorists on the highways, and lowering automobile liability rates by vesting ownership of the costs of liability insurance in the insured and uninsured alike. Having so found, we further note that it is not our role to consider the legislature's wisdom in adopting a statute. Chamberlain v. State, Through DOTD, 624 So.2d 874. Accordingly, we find that La.R.S. 32:866 is rationally related to the legislature's stated public purpose of promoting compliance with the state's compulsory liability insurance law and in taking the initiative so that the concomitant benefits may flow therefrom. Thus, we find that Act 1476 does not violate the plaintiffs' right to equal protection under either the state or federal constitutions.[18]Accord Quackenbush v. Congress of California Seniors, No. A078530 (1st Dist. 12/24/97), 60 Cal.App.4th 454, 70 Cal.Rptr.2d 271; Yoshioka v. Superior Court of Los Angeles County, No. B110759 (2nd Dist. 10/27/97), 58 Cal. App.4th 972, 68 Cal.Rptr.2d 553.
We now turn to the issue of due process. As we appreciate the argument of plaintiffs, it is their contention that the statute unconstitutionally limits their causes of action for recovery of the first $10,000 in property damages and the first $10,000 for bodily injury or abolishes them where the uninsured drivers' damages do not exceed $10,000 for each type of damage.
Unlike Louisiana's provision on equal protection which is distinct from that provided in the Fourteenth Amendment, our due process guarantee in La. Const. Art. I, § 2 does not vary from the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In essence, the crux of due process " is protection from arbitrary and unreasonable action and when the ordinance or statute does not affect fundamental rights, but rather is merely economic or social regulation, it need only have a rational relationship to a legitimate governmental interest." Med Exp. Ambulance Service, Inc. v. Evangeline Parish Police Jury, 96-0543 (La.11/25/96), 684 So.2d 359, 365.
In Burmaster v. Gravity Drainage District No. 2 of the Parish of St. Charles, 366 So.2d 1381 (La.1978), we stated:
Where an injury has occurred for which the injured party has a cause of action, such cause of action is a vested property right which is protected by the guarantee of due process. However, where the injury has not yet occurred and the cause of action has not yet vested, the guarantee of due process does not forbid the creation of new causes of action or the abolition of old ones to attain permissible legislative objectives. Our jurisprudence has recognized the validity of legislative regulation of causes of action, including replacement and even abolition, that one person may have against another for personal injuries.
Burmaster, 366 So.2d at 1387. (Citations omitted).
Moreover, in Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the United States Supreme Court stated:
[T]he State remains free to create substantive defenses or immunities for use in adjudicationor to eliminate its statutorily created *689 causes of action altogetherjust as it can amend or terminate its welfare or employment programs. The Court held as much in Martinez v. California, 444 U.S. 277, 100 S.Ct. 553[, 62 L.Ed.2d 481] ... (1980), where it upheld a California statute granting officials immunity from certain types of state tort claims. We acknowledged that the grant of immunity arguably did deprive the plaintiffs of a protected property interest. But they were not thereby deprive of property without due process, just as a welfare recipient is not deprive of due process when the legislature adjusts benefit levels. In each case, the legislative determination [to adjust the cause of action] provides all the process that is due, see Bi-Metallic Investment Co. v. State Bd. Of Equalization, 239 U.S. 441, 445-446, 36 S.Ct. 141, 142-43[, 60 L.Ed. 372] ... (1915); it "remain[s] true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." Martinez v. California, 444 U.S., at 282, 100 S.Ct.[,] at 557. Indeed, as was acknowledged in Martinez, it may well be that a substantive "immunity defense, like an element of the tort claim itself, is merely one aspect of the State's definition of that property interest.
Logan, 455 U.S. at 432-33, 102 S.Ct. at 1156.
Applying this jurisprudence to the present case, it is clear to us that there is no fundamental due process right to sue in tort or to recover damages because of the tortious acts of another. See also Hoffman v. United States, 767 F.2d 1431 (9th Cir. 1985); Crier v. Whitecloud, 496 So.2d 305 (La.1986); Bazley v. Tortorich, 397 So.2d 475 (La.1981); Stuart v. City of Morgan City, 504 So.2d 934 (La.App. 1 Cir.1987). As such, by restricting or eliminating causes of action which uninsured motorists may have had for these types of damages, the legislature has simply redefined the scope of the causes of action in tort which it will permit. After examining the reasons for the legislature's action as elucidated in our discussion of equal protection, it cannot be said that such action was arbitrary or irrational. As such, we find that Act 1476 is not violative of the plaintiffs' right to due process.
In reaching these conclusions, we find that our decision conforms with the result reached in Yoshioka,[19] a California case which reviewed a statute which, among other matters, denied uninsured motorists the right to recover for non-economic damages.[20] In addressing the issues of due process and equal protection, the California Court stated:
Drivers either possess insurance or they don't. If they don't and they choose to drive (instead of using other alternative modes of transportation like public transit), we can think of no justifiable defense that would require a hearing.
* * *
Further, as Proposition 213 encourages more uninsured drivers to buy auto insurance, tax-paying and law abiding citizens will no longer be required to carry the burden of paying for those citizens that choose to directly defy the current state of the law. It was rational for the electorate to believe that a classification that eliminates the uninsured would achieve a legitimate interest in restoring balance to our justice system.
Yoshioka, supra, 58 Cal.App.4th at 989, 991, 68 Cal.Rptr.2d 553.
Likewise, in Quackenbush, another California Court stated:
Proposition 213's primary classification was a division between the group of people who obey the law by purchasing automobile *690 insurance, driving sober, and committing no vehicle-related felonies and the group of people who violate these drivingrelated laws and are disfavored because of their violations. CCS [Congress of California Seniors] cannot reasonably argue that, when allocating the pool of insurance proceeds among members of these two groups, it is unfair or irrational to favor the law-abiding group or that it is irrational for the first group to be relieved of the obligation to pay insurance rated determined in part by the need to pay noneconomic damages (and in the case of felons all damages) to the second group.
Quackenbush, 60 Cal.App.4th at 466, 70 Cal. Rptr.2d 271.
After reviewing the Yoshioka and Quackenbush decisions, we find that the same may be said about Act 1476's bar of recovery of the first $10,000 damages.

ACCESS TO COURTS
In the preceding section, we determined that uninsured motorists neither comprise a suspect class nor have a fundamental right to exercise the privilege to drive without insurance. We likewise found that uninsured motorists do not have a fundamental right to tort recovery. We now consider plaintiffs' contention that Act 1476 causes uninsured motorists to forfeit property without the right to judicial review and unduly restricts access to the judicial system.
La. Const. Art. I, § 19 provides, in pertinent part:
No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.
It is axiomatic that in order for there to be a violation of § 19, we must find that the statutory preclusion of recovery for the first $10,000 constitutes the loss of a property right. As found by us, uninsured motorists do not have a property right since the legislature has restricted their legal remedy. "[T]he guarantee of due process does not forbid ... the abolition of old [causes of action] ... to attain permissible legislative objectives." Burmaster, 366 So.2d at 1387. Accordingly, we find that no violation of La. Const. Art. I, § 19 has occurred since we already found that the legislature has curtailed a cause of action. Since we have already found that such legislative action is reasonably related to the state's concern in obtaining more complete compliance with the compulsory liability insurance law, we find no merit to the plaintiffs' contention.
La. Const. Art. I, § 22 provides:
All courts shall be open and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
This clause does not prohibit legislative restriction of legal remedies. Rather, this clause only ensures that the judicial system will be open to provide remedies that the legislature has fashioned. Williams v. Mumphrey, 95-CA-643 (La.App. 5 Cir. 1/30/96), 668 So.2d 1274, writ not considered, 96-0569 (La.3/29/96), 670 So.2d 1240; Sons v. Inland Marine Service, Inc., 577 So.2d 225 (La.App. 1 Cir.1991); Williams v. Kushner, 524 So.2d 191 (La.App. 4 Cir.1988), amended and affirmed, 549 So.2d 294 (La.1989).
In the case sub judice, the fact that certain uninsured motorists cannot pursue a claim for part or, in some instances, all of their damages does not deny them access to the judicial system. To the contrary, their right to seek redress to the courts is simply curtailed in accordance with the legislative authority to restrict legal remedies.

DECREE
For the foregoing reasons, we find that the trial court correctly upheld the constitutionality of Act 1476. Accordingly, we affirm the judgment of the trial court.
AFFIRMED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, Judge, dissenting.
In Sibley, this court rejected and abandoned the United States Supreme Court's *691 three-tiered approach to equal protection analysis in interpreting La. Const. Art. I, § 3. In Sibley, we found that the federal equal protection standard "is not an appropriate model for interpreting and applying the protection of equal laws pledged by our state constitution." Sibley, 477 So.2d at 1104. This court has consistently acknowledged the Sibley equal protection analysis as the appropriate model for our state's citizens. See Whitnell v. Silverman, 95-0112 (La.12/6/96); 686 So.2d 23 Manuel v. State of Louisiana, 95-2189 (La.7/2/96); 692 So.2d 320, 338[1]; La. Associated Gen. Contractors v. State, 95-2105 (La.3/8/96); 669 So.2d 1185; Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96); 668 So.2d 1135, 1140; Crier v. Whitecloud, 496 So.2d 305 (La.1986); 686 So.2d 23, Rehearing denied, (12/6/96).
While state constitutions cannot be interpreted to afford less protection than the federal Constitution because such an interpretation would violate the federal supremacy clause, a state constitutional provision can certainly be intended to afford and construed as affording greater protection than its federal counterpart. Spaht, Lorio, Picou, Samuel & Swaim, The Forced Heirship Legislation: A Regrettable "Revolution", 50 La. L.Rev. 409, 420 (1990). La. Associated Gen. Contractors provides the following:
"[T]he crucial reality is that the state equality guarantee was not written solely to mimic the federal Equal Protection clause. Interpretation of the state provision solely or even primarily by reference to federal precedents is untrue both to the plain language of Section 3 and to the intentions of those who wrote it.... The textual differences between the state and federal provisions are self evident. It is also clear that the expanded language of § 3 of the Louisiana Declaration of Rights was intended to provide more extensive protection for equality interests than is available under the federal Equal Protection Clause." La. Associated Gen. Contractors, 669 So.2d at 1197, quoting, [citations omitted].

In finding that Act 1476 does not violate the plaintiffs' right to equal protection, the majority has failed to apply the Sibley equal protection analysis, to a significant classification created by Act 1476the classification based on physical condition. Instead, this court has focused only on the classification of whether or not a motorist is insured. When a court fails to properly analyze a case pursuant to Sibley, significant determinations, such as which party bears the burden of proof and the applicable level of scrutiny, may be misapplied.
As we recognized in Sibley, La Const. Art. I, § 3 imposes limitations regarding classifications based on "birth, age, sex, culture, physical condition, or political ideas." Classifications based on any of these six enumerated grounds are a prima facie denial of equal protection. Moore, 668 So.2d at 1140. The ordinary presumption that statutes are constitutional is inapplicable, and the person seeking to have the law upheld must prove the constitutionality of the law. Moore, 668 So.2d at 1140. See also, Michael Lester Berry, Jr., Equal ProtectionThe Louisiana Experience in Departing From the Generally Accepted Federal Analysis, 49 La. L.Rev.3 903, 904 (1989). Accordingly, the burden of proof switches to the proponent of the law to demonstrate that the classification "substantially furthers a legitimate state purpose." Sibley, 477 So.2d at 1109.
In the instant case, the challenged Act 1476 prohibits uninsured motorists from recovering the first ten thousand $10,000 of damages for bodily injuries, as well as the first ten thousand $10,000 of property damages resulting from automobile accidents, regardless of fault.[2] Act 1476 creates two classes of individuals: one, a class of uninsured motorists suffering damages in excess of $10,000 for bodily injury and/or property damage resulting from an automobile accident; second, a class of uninsured motorists suffering damages less than $10,000 for bodily *692 injury and/or property damage resulting from an automobile accident. Victims in the former class are allowed recovery for their damages for the amount in excess of the first $10,000 in damages for bodily injuries and/or property damage. However, individuals in the second class, those who happen to sustain bodily injuries and/or property damage in an amount less than $10,000, are totally barred from recovery. More pointedly, the single determinant of whether or not an uninsured motorist will be allowed any recovery for bodily injuries is the severity of the individual's injury. The extent of the physical condition of each injured uninsured motorist is the sole cause of his being assigned to one of the two classes. Therefore, Act 1476, on its face, is designed to impose different burdens on different classes of persons according to the magnitude of damage to their physical condition. See Sibley, 477 So.2d at 1108.[3] Accordingly, the burden of proof switches to the proponents of Act 1476 to demonstrate that this classification based on physical condition "substantially furthers a legitimate state purpose." Sibley, 477 So.2d at 1109.
In the instant case, the proponents' primary purported purpose for the enactment of Act 1476 is the reduction of automobile insurance premiums. A secondary purpose is to insure that motorists will maintain the minimum mandatory automobile liability insurance coverage as required by law. The State maintains that the Legislature passed Act 1476 because of concerns about the following:
1. The high percentage of motor vehicle accident claims of all lawsuits filed in Louisiana's state courts;
2. The positive effect of civil justice reforms toward reduction of the cost of motor vehicle insurance;
3. Legislation to reduce premium rates of motor vehicle insurance;
4. Compliance with the Motor Vehicle Safety Responsibility Law;
5. Correction of imbalances and abuses prevalent in Louisiana's current civil law and motor vehicle insurance systems; and
6. A direct cost savings to all citizens of the state of Louisiana.
The State maintains that Act 1476 is designed to address these concerns and accordingly, Act 1476 will decrease the number of lawsuits filed as a result of automobile accidents, thereby decreasing automobile insurance premiums.
In the instant case, the record reveals that there are several factors that contribute to the status and cost of automobile insurance premiums and civil litigation resulting from automobile accidents. Reforming Automobile Insurance 1997, A Special Report (hereinafter referred to as "Report 1") was prepared by the Louisiana Department of Insurance under the direction of the Commissioner of Insurance, Jim Brown, and submitted into evidence by defendants.[4] In Report 1, it is asserted that Louisiana policyholders must absorb cost increases brought about by the following factors:
1. The high number of uninsured/underinsured motorists (estimates run as high as 50% in some areas of the state);
2. The ages of our drivers (15-year-old unrestricted drivers);
3. The absence of mandatory driver's education;
4. The state-wide poor road conditions;
5. The poor condition of many of our automobiles, due in part to improper inspections in some stations;
6. The frequencies of fraud (numerous insolvencies and criminal referrals) and the questionable number of frivolous lawsuits (a greater number than the national average of all those injured in Louisiana traffic accidents use lawyers); *693 there are 49 injury claims for every 100 property damage claims;
7. [Laxed] enforcement of drunk driving laws; and
8. Mixing driving with alcohol, and alcohol consumption by minors.
Report 1 provides statistics regarding the impact several of these factors have on the number of automobile accidents in this state. Of the eight factors listed in Report 1 as the reasons policyholders pay higher insurance premiums, Report 1 maintains that one factor alonethe youthful age of drivers, is a major contributing factor to the number of automobile accidents. For example, Report 1 states that although only 5% of licensed drivers are under the age of 19, nearly 12% of all crash deaths are teenagers. Report 1 further cites data by the National Safety Council in noting that sixteen-year-olds have 40 crashes per 100 licensed drivers each year, compared with a rate of nine crashes per 100 licensed drivers who are 45 to 54 years old.[5] Report 1 notes that "[d]ata compiled by the Louisiana Highway Safety Commission shows that only drivers over the age of 84 die more frequently in auto accidents than do those under the age of 20. The younger the driver the greater the likelihood that they will be involved in a fatal crash. Young drivers, especially those in their teens, are far more likely to be seriously injured in crashes than any other drivers."[6]
The Louisiana Department of Insurance further notes in Report 1 that in addition to youthful drivers, drunk driving is another major contributor to automobile accidents. The Report states that accidents resulting from drunk driving costs innocent victims $26,000.[7] Relative to this factor, Report 1 states the following:
"In 1994, 51% of traffic fatalities in Louisiana involved the use of alcohol, while alcohol contributed to 41% of traffic deaths nationwide. Twenty-four percent of drivers had blood alcohol contents of 0.10 or greater in this state, compared to 19% countrywide. Eight percent of the drivers had BAC between 0.01 and 0.09 in Louisiana, compared to 6% countrywide. Clearly, residents in Louisiana are exposed to greater inciden[ts] of traffic deaths involving alcohol than people living elsewhere. This adds to the escalation of insurance losses and, hence, high automobile insurance premiums in this state. Louisiana recorded a 2.2% increase in traffic fatalities that involved the use of alcohol in 1995. The rate rose from 51% in 1994 to 53.2% in 1995, while the national average remained the same...." Defendants' Exhibit 2, pp. 44-45.

The State further notes that "Louisiana is the 5th highest state in the nation with alcohol related traffic fatalities at 53.2%."[8]
Although the State provides statistical evidence of the impact of several factors on the number of automobile accidents, the record is silent as to statistical evidence of the actuarial impact uninsured motorists have on the number of automobile accidents. The State in the instant case provides no corroborating, statistical evidence, or results of studies to support its position as it relates to uninsured motorists.[9]
More specifically and importantly, based on Report 1, if sixteen-year-olds are involved in 40% of automobile accidents, and drunk drivers comprise approximately 50% of traffic *694 fatalities, how can disallowing uninsured motorists recovery for the first $10,000 in damages alone "substantially" further the legitimate state purpose of decreasing insurance premiums? Thus the State has neither statistical evidence, nor any kind of corroborating evidence whatsoever to support a finding that there is a substantial relationship between the group disadvantaged by the discriminatory classification of Act 1476 and the asserted governmental interest. Therefore, the State has failed to satisfy its burden of proving that the classification based on physical condition "substantially furthers a legitimate state purpose." Moreover, absent some type of evidential support, any conclusions about the relationship between the classification and the legislative purpose are be based on mere speculation.
Thus, Act 1476 is contrary to equal protection of the laws under the analysis and principles established by this court in Sibley. Moreover, because Act 1476 fails to "substantially further a legitimate state purpose," I am of the opinion that the classification based on physical condition is arbitrary, capricious and unreasonable.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Pursuant to Rule IV, Part 2, Section 3, Justice Marcus was not on panel. Recused.
[2] For purposes of clarity, it is noted that only LAFAC included the Attorney General as a party defendant. As a practical matter, it is of no moment that Progressive did not make the Attorney General a party defendant, since the two cases were consolidated and both Progressive and LAFAC raise identical constitutional challenges.
[3] We note that we are not exercising our appellate jurisdiction under La. Const. Art. V, Section 5(D) since that is limited to instances where "a law or ordinance has been declared unconstitutional." (Emphasis added). Rather, we have chosen to exercise our supervisory jurisdiction which has been granted us in La. Const. Art. V, Section 5(A). "The constitutional grant of supervisory authority to this court is plenary, unfettered by jurisdictional requirements, and exercisable at the complete discretion of the court." State Bond Com'n v. All Taxpayers, Property Owners, and Citizens of State, 510 So.2d 662, 663 (La.1987). See also State v. Peacock, 461 So.2d 1040 (La.1984); Hainkel v. Henry, 313 So.2d 577 (La.1975); McClelland v. Gasquet, 122 La. 241, 47 So. 540 (1908).
[4] Certain exceptions are recognized in La.R.S. 32:866(A)(3).

The limitation of recovery provisions of this Subsection do not apply if the driver of the other vehicle:
(a) Is cited for a violation of R.S. 14:98 as a result of the accident and is subsequently convicted of or pleads nolo contendere to such offense.
(b) Intentionally causes the accident.
(c) Flees from the scene of the accident.
(d) At the time of the accident, is in furtherance of the commission of a felony offense under the law.
[5] See Louisiana Associated General Contractors, Inc. v. State, Through Div. of Admin., 95-2105 (La.3/8/96), 669 So.2d 1185 for a discussion of when an association has standing to bring an action.
[6] Section 6 of Act 1476 provides:

Because the legislature finds and declares that questions of law may be raised by some persons with respect to the constitutionality of some of the provisions of the Omnibus Premium Reduction Act, the public welfare requires that such questions of law be resolved with expedition prior to such time as its provisions take effect in order to avoid disruption of the orderly implementation of its provisions. Therefore, the legislature finds that the remedy of declaratory judgment to determine the constitutionality of the provisions of the Omnibus Premium Reduction Act should be immediately made available in order to avoid confusion by the public. Therefore, any domiciliary of this state may institute an action in the Nineteenth Judicial District Court seeking a declaratory judgment to determine the constitutionality of the provisions of the Omnibus Premium Reduction Act. The attorney general and the commissioner of insurance shall be served with a copy of the proceeding and be entitled to be heard. In the interest of further expediting this procedure, the Nineteenth Judicial District Court, First Circuit Court of Appeal, and Louisiana Supreme Court are urged to minimize all unnecessary delays and may suspend all applicable rules of court in contravention hereof and for this limited purpose.
[7] Rule VII, Section 4, Supreme Court, requires that "[t]he brief for the appellant ... shall set forth: ... (3) a specification of the alleged errors complained of;....". A review of the appellants' brief filed with us shows that they have not raised all of the constitutional challenges brought in the district court. Therefore, we find that the following arguments made in the trial court are not before us: (1) the impact on existing insurance contracts impairs the obligations in existing contracts in violation of La. Const. Art. I, Section 23; (2) the aggregate effect of these "denials of recovery" expands compulsory automobile insurance in violation of La. Const. Art. I, Section 4, which protect the right to control, use, enjoy, and protect private property, subject to "reasonable" restriction; and, (3) Section 3 of the Act is impermissibly vague in its definition of "economic loss only;"
[8] Progressive and LAFAC have not cited any jurisprudence, and we have not found any, to support their contention.
[9] For example: La.R.S. 32:402 (all drivers must secure a license); La.R.S. 32:402.1 (driver education is required); La.R.S. 32:403.1 (first time drivers 60 years of age or older must present medical and optometrical report); La.R.S. 32:403.2 (physically or mentally handicapped persons must present a detailed medical report); La.R.S. 32:407 (graduated driving privileges for minors); La.R.S. 32:408 (examination of driving applicants is required); La.R.S. 32:411.1 (driver must have license in his possession while driving); La.R.S. 32:414 (suspension of license provided for conviction of operating a vehicle under the influence of alcoholic beverages or narcotic drugs; conviction of felonies involving the operation of a vehicle); La.R.S. 32:416.1 (persons under the age of seventeen cannot drive a vehicle between 11 p.m. and 5 a.m. unless accompanied by a parent).
[10] As an aside, see our discussion in State v. Page, 332 So.2d 427 (La.1976) in which we held that proceedings to revoke local licenses to drive a motor vehicle, a corollary administrative action, are generally regarded as civil proceedings. Accordingly, we determined that the district attorney's petition to have a defendant declared an habitual offender under the Motor Vehicle Habitual Offender Law, La.R.S. 32:1471 et seq., was a civil proceeding.
[11] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8.
[12] From statistical data analyzed, the Actuarial Subcommittee projected savings between 4.3% and 10% on basic coverage and between 2.4% and 4.8% on full coverage. Louisiana Task Force for Reduction of Automobile Insurance RatesReport of the Actuarial Subcommittee, March 5, 1997. Likewise, since motor vehicle insurers will not pay the first $10,000 of bodily injury or the first $10,000 property damage to an uninsured motor vehicle owner due to the negligence of an insured driver, motor vehicle insurers will experience a reduction of liability losses and loss adjustment expenses. LIRC Bulletin 97-03, July 25, 1997.
[13] It must be remembered that the Commissioner of Insurance served with members of the insurance industry on the Actuarial Subcommittee. It was these persons who independently performed the actuarial assessment based upon the peculiar data available to each. It is also worthy to note that it was the LIRC which staffed the governor's Task Force.
[14] This point is well made by the legislative inclusion of the provision in Section 5(A) that allows motor vehicle insurers an opportunity to demonstrate at a rate hearing before the LIRC that a rate decrease would generate inadequate funds.
[15] We note that in the trial court, Progressive and LAFAC also argued that the use of the words "economic loss" in Act 1476 made the statute impermissibly vague. Though vagueness is still an issue before us, no reference has been made to the term "economic loss" in argument or brief. Accordingly, we do not find that the issue of vagueness relative to the term "economic loss" is now before us.
[16] The basis for plaintiffs' equal protection challenge is their assertion that uninsured motorists constitute an "unpopular group" and, as such, fall within a suspect classification. Suspect classifications have been identified as those which involve certain unalterable traits such as race, alienage, and religion. Everett v. Goldman, 359 So.2d 1256 (La.1978). In the present case, it is clear that uninsured motorists do not constitute a suspect class. Act 1476 simply differentiates between insured and uninsured drivers. Unlike those traits identified in Everett, those motorists who are uninsured are so constituted by choice, i.e., on their own volition they have placed themselves into this category by choosing not to obtain the minimum levels of liability insurance mandated by La.R.S. 32:861(A)(1) and 32:900.
[17] Driving without insurance is clearly not a fundamental right which triggers heightened federal equal protection analysis. In Louisiana, driving without insurance is illegal. See La.R.S. 32:861(A)(1), 32:863(A)(1), 32:864, 32:865(A) & (B), and La.R.S. 32:900. Moreover, as noted earlier, driving itself is not a fundamental right; instead, it is a privilege granted by the State which has restricted the exercise of that privilege. Spencer, supra; Harrison, supra. See also, State v. Page, supra n. 10.
[18] Plaintiffs' reliance on Glona v. American Guarantee & Liability Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) and City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) is misplaced. In both Glona and City of Cleburne, the Supreme Court found no "rational basis" for the discriminatory treatment. In the case sub judice, the record fully establishes that the state's action is rationally related to its legitimate interest of reducing insurance rates and prodding drivers to acquire automotive liability insurance.
[19] In Yoshioka, the California court was also faced with the retroactive application of the newly enacted law; as found by the California court, the law could be applied retroactively. We are not faced with the issue of retroactivity, since Act 1476 applies only prospectively.
[20] In addition to uninsured motorists, Proposition 213 also prohibited drunk drivers from collecting non-economic damages in any action arising out of the operation or use of a motor vehicle and further prohibited the recovery of any damages by felons for injuries caused in the commission of or flight from a felony. Prop. 213; Cal.Civ.Code §§ 333.3, 333.4.
[1] Also published at 677 So.2d 116.
[2] Pursuant to Act 1476, if an insured and uninsured motorist are involved in an automobile accident, the uninsured motorist cannot recover for the first $10,000 of damages for bodily injuries and/or property damage, even if the insured motorist is 100% at fault.
[3] In Sibley, we held that statutory limitation against medical malpractice judgments in excess of $500,000 classifies individuals because of their physical condition in that victims with damages in excess of that amount are prevented from recovering for all of their damage while victims with damages less than that amount are allowed full recovery. Sibley, 477 So.2d at 1108, 1109. See also, Whitnell v. Silverman, 95-0112 (La.12/6/96); 686 So.2d 23, 27, Rehearing denied, (La.12/6/96).
[4] Defendants' Exhibit 2.
[5] Defendants' Exhibit 2, p. 27.
[6] Defendants' Exhibit 2, p. 28.
[7] Comparable crime cost per victim: Assault $19,000; Robbery$13,000; and Motor Vehicle Theft$4,000.
[8] Defendants' Exhibit 3, Appendix 3.
[9] Cf., Manuel v. State of Louisiana, 95-2189 (La.7/2/96); 692 So.2d 320, 338. In upholding the constitutionality of Act 639, which raised the minimum drinking age in this state from eighteen to twenty-on, this court relied on statistics and other corroborating evidence propounded by the proponents of the law. We stated:

"These statistics compared the specific group disadvantaged by the discrimination with the general group of licensed drivers and established, among other things, that the disadvantaged group was involved in twice as many accidents per capita as the general group and that Louisiana ranked above forty-six other states in the percentage of alcohol-related fatalities involving drivers under twenty-one." Manuel, 692 So.2d at 343. See also, Manuel, 677 So.2d at 122 [published in duplicate].