h MURRAY, Judge.
Defendants, Thomas Lee Whaley, III and the New Orleans City Park Improvement Association, appeal the trial court’s award of damages and equitable relief in favor of the plaintiffs, Iris and Sundance Morgan.[1] We reverse the award of damages for the reasons that follow.
FACTS AND PROCEEDINGS BELOW
In their petition filed March 31, 1989, the Morgans asserted that prior to April 1, *410 1988, they had been permitted virtually unrestricted use of the tennis courts at New Orleans City Park for their instructional clinics and related activities. They alleged, however, that after the Improvement Association illegally contracted with Mr. Whaley to operate the tennis courts and related facilities, arbitrary guidelines and regulations, specifically enumerated in the petition, had been instituted in April 1988 “which were not uniformly applied to all citizens.” The Morgans sought damages for economic losses as well as for deprivation of rights, and asked for an injunction prohibiting enforcement of the contract between the Improvement Association and Mr. Whaley. The petition subsequently was 1 ¡.amended to withdraw both the claim for economic losses and the prayer for injunctive relief. Instead, the Morgans asked for a prohibition against further violations of their constitutional rights and for damages to compensate for their intangible injuries. The defendants answered both the original and amending petitions with general denials'.
At the July 1998 bench trial, Mr. Beauregard L. Bassich, executive director of the City Park Improvement Association, explained that in 1987, the Board of Commissioners was advised that there would no longer be any recurring funds for the Park’s routine maintenance and operations. It thus became essential that all of the recreational facilities, including the Tennis Center, generate sufficient revenues to cover all expenses other than for capital improvements. At the same time, however, the Association’s primary purpose remained the promotion of public access and enjoyment of the Park.
Mr. Bassich ■ further testified that the City Park tennis facilities are administered by the Board of Commissioners through a Tennis Committee, which submits recommended policies, rules and regulations for Board approval. In accord with the Committee’s investigation and recommendation, the Board entered into a contract with Harbour Management, Inc. in December 1987 for the administration, management and operation of the Tennis Center and surrounding areas. In conjunction with this agreement, the Board issued a public notice that new rules would be implemented regarding the use of the tennis facilities, and particularly concerning those who provided tennis instruction at City Park. This notice explicitly authorized the Director of Tennis, the position then held by Thomas L. Whaley, III, to “institute procedures and regulations governing ... the number and qualification of tennis teachers ... and the manner in which their services are offered to the general public.” However, the Board acknowledged that |3the new policies “will not prevent any member of the public from providing instruction to another person from time to time ... as a result of private arrangements,” as long as that did not violate “the manner and spirit in which [the new policies] were intended.”
On March 17, 1988, Mr. Whaley sent a letter to the Morgans outlining the new rules and regulations which were to go into effect on April 1, 1988. Because the Board’s prior notice expressly required all instructors affiliated with -the Park to be certified by the U.S. Professional Tennis Association (USPTA), the Morgans were invited to join that organization and to become members of the City Park teaching staff, which would entitle them to preferential use of the tennis facilities subject to special regulations. They were advised, however, that “[a]ll other tennis players who are not members of the teaching staff will be expected to follow the general rules regarding court prices, reservation procedures and facility rules” that would soon be in effect.
Mr. Morgan testified that he, his wife and various assistants had provided tennis lessons at City Park under the name of “Team Sundance” since about 1975, teaching groups as well as individuals. Until 1988, the Park charged only minimal fees for court rentals on a quarterly basis, with the result that, “for a thousand dollars a *411 year, you could essentially be in business.” Although he had not completed any certification process with a professional organization, Mr. Morgan paid approximately $120 per year in dues to belong to the U.S. Professional Tennis Registry (USPTR), which also provided insurance coverage. While the annual cost for membership in the USPTA and the USPTR was comparable, the fees for certification by the former group, as required by City Park, was approximately double the amount charged by the latter organization. In addition, an instructor who opted to become a “City Park pro” would be subject to a fee schedule set by | ¿the Park and, whenever there were more than four students, the Park would retain a portion of the fee.
Mr. Morgan testified that at the time this new system and the accompanying rule changes were announced, there were between twenty and twenty-five people who used the City Park courts on a regular basis to provide tennis lessons. However, in addition to giving private lessons to individuals, he was one of the few instructors who conducted several large group programs. Because the new system would thus impact Team Sundance differently than most of the others, Mr. Morgan and his wife proposed that they be permitted to obtain USPTA certification but otherwise function independently, as they had in the past. Although some minor changes in the new system were made after many of the instructors voiced their complaints at a Tennis Committee meeting in late March 1988, all other suggestions were rejected, including Mr. Morgan’s proposed accommodation for what he considered to be his special circumstances.
Mr. Morgan and his wife decided that affiliation with City Park on Mr. Whaley’s terms was unacceptable and they, along with a few of the other instructors, declined to join the teaching staff. Accordingly, Mr. Whaley informed them that Team Sundance would be subject to the new rules set for court usage by the general public. These rules, which were posted throughout the facilities and printed on the back of the rental tickets, included the following limitations at issue in this suit:
Tennis players may not use more than 3 tennis balls on the courts at any time. No more than four individuals may be on any tennis court at any given time. Posting of notices, signs and banners anywhere in the tennis facility is prohibited without permission of the Tennis Director.
lBThus, the Morgans were no longer able to place a basket of balls on the courts for repetitive drills by their students; they had to rent more courts to provide lessons to large groups; and they were not permitted to advertise for customers or display indicators of commercial sponsorship for their programs, as in the past.
Iris Morgan, a full-time elementary schoolteacher, testified that enforcement of the first two rules caused her to stop teaching tennis on weekends because she was not physically able to keep up with her young students under those conditions. She named several others similarly impacted by the new limitations, who either began using another facility or gave up teaching altogether. The three-ball rule, in particular, resulted in Mr. Morgan’s exclusion of all children under the age of nine from Team Sundance because more time was spent chasing balls than playing tennis.
During the trial, the parties stipulated “that the rules and regulations ... at issue here, do, in fact, serve legitimate state interest in revenue raising, public safety and public enjoyment and are rationally related to those objectives.” After entry of this stipulation, plaintiffs’ counsel emphasized that while they agreed that “there’s a rational basis for the rules, ... the purpose that we’re here is that we don’t believe that those rules have been equally enforced.”
In support of this claim of discriminatory enforcement, John Trinh, one of Mr. Morgan’s assistants, testified that on sev *412 eral occasions in the past five years he had seen others using baskets of balls while teaching more than three students on one City Park tennis court. One such group was Newman High School, but he had also seen some individuals, whose names were unknown, violating the rules without any reaction from City Park officials. Mr. Trinh said he, on the other hand, was often harassed by staff members questioning him about how many balls he was using and whether he had purchased a ticket for use of the court. He | ¡^admitted, however, that he had been “let go” from the City Park Tennis Club, a private organization, for violating similar club rules, and that, in fact, he had sometimes played on City Park courts without purchasing a ticket. Mr. Trinh also acknowledged that the three-ball rule had been somewhat relaxed to permit play with five or six balls at a time.
Similarly, Iris Morgan testified that when the rule changes went into effect, “We were targeted and other instructors were using baskets, people from other organizations: Delgado, playeare groups, different groups throughout the city, clinics, were all using baskets.” She named some individual instructors she had seen with baskets of balls on the court, but admitted she did not know whether or not they had joined the City Park staff. As previously mentioned, Ms. Morgan knew that enforcement of the new rules against others who gave private lessons had resulted in their departure from City Park’s facilities.
Numerous photographs, dated from 1989 to 1998, were introduced as evidence that the rules prohibiting baskets of balls and only four people on a court were not enforced against everyone. Mr. Morgan identified most of the photos as showing clinics and tournaments put on by such organizations as the New Orleans Tennis Association; New Orleans Recreation Department (NORD); Delgado Community College; a local nonprofit entity known as The Louis Armstrong Group; and the U.S. Tennis Association (USTA). Other groups shown to be using baskets of balls included the Metairie-Kenner Playeare Center and Sacred Heart High School, as well as . “a very large promotional clinic that is sponsored by a lot of companies,” identified as Nick Bollettieri’s Traveling World Tennis Tour. Both the latter event and a New Orleans Tennis Association Clinic were shown to have been advertised on the Tennis Center’s bulletin boards, and sponsorship banners were visible in some of the pictures.
|7According to Mr. Morgan, none of the instructors shown in the photos were members of the City Park staff, and he believed, but could not be certain, that most were being paid for their services. He further testified that in many cases, a Tennis Center employee would walk right past the courts where these violations occurred to question him about* how many courts he had reserved that day. Like Mr. Trinh, Mr. Morgan described incidents in which he believed a staff member was trying to provoke him with rudeness and disrespect, and he often felt that he was deliberately assigned to courts that were in poor condition. Although he is now allowed to hang a “Team Sundance” banner and an American flag on the courts he is using, the City Park staff will not allow him to post the type of sponsorship banners seen in the photos he introduced.
Mr. Morgan explained that he charges a per-person fee for private lessons provided by himself or one of his assistants, and there is also a charge for students participating in his clinic and summer camp programs. In addition, he is paid a per-child fee for after-school programs provided under his “special arrangements” with three local schools. In some cases, however, Mr. Morgan provides scholarships or reduced rates to promising needy' students. On weekends, he books courts and arranges matches between players of similar skill levels, charging only enough to cover the *413 cost of the court rentals.[2] Mr. Morgan testified that he conducts his classes year-round, and that he generally rents a block of contiguous courts for his programs. He and his staff also volunteered instructional time one year for a Tennis Association clinic held in conjunction with the Sugar Bowl Tournament.
Mr. Morgan acknowledged that although the Delgado program had been j Roperated in violation of the general rules for about two years, it had been taken over by the City Park staff some years ago. He further admitted that in most of the tournaments and clinics reflected in his photographs, the participants paid no fee, whether or not the instructors were paid for their time. Mr. Morgan also testified that the current Tennis Director had recently explained that with proper documentation, he could be allowed to use baskets of balls for his Christian Brothers school program. However, with only three more weeks left in that program, Mr. Morgan had decided to await the outcome of this litigation to see what, if anything, he would do.
Paul C. “Chris” Barbe testified that he replaced Mr. Whaley as Director of Tennis at City Park in late 1989 and held the position until August 1991, when he left. He returned to the City Park staff in 1994 as an assistant pro, was then promoted to head pro, and in August 1996 again became Director of Tennis. Mr. Barbe explained that other than City Park’s eight tennis instructors, there are, at most, only three staff members on duty to operate the Tennis Center and supervise the thirty-six courts: one outside maintenance employee, one person in the pro shop, and himself. He admitted that with this limited staff, they could not always catch every violation of the rules limiting the number of people and balls on a court, but felt that “we do a fair, fair-to-middling job.”
Mr. Barbe further explained that while City Park usually provided free court usage for nonprofit programs such as The Louis Armstrong Group, NORD, and the USTA, the tournaments and other special events generally brought in reyenue from court rentals and pro shop sales. Because the Board considered these to be “community service” activities that were to be encouraged, they were exempted from the limitations and rules applied to the general public. In addition, such programs were generally intermittent and short-term, rather than the year-round, lflongoing activities of Team Sundance. School programs, like those provided by Delgado and Sacred Heart, were required to either engage a City Park pro as instructor, at the standard rates, or to abide by the rules applicable to the general public. Mr. Barbe testified that, in fact, when Mr. Morgan complained about those particular schools, he took action to bring them into compliance. While Delgado subsequently arranged for a City Park instructor to operate its program, Sacred Heart had moved to the University of New Orleans.
Because Mr. Barbe was not involved in the original implementation of the rules at issue here, he could not testify with certainty regarding the intended purpose of each regulation. In his view, however, both the three-ball rule and the four-to-a-court limitation promoted safety and public enjoyment by reducing the risk of balls flying into other courts as well as the distraction of noisy groups. On questioning by the court and on cross examination, Mr. Barbe admitted that when baskets of balls were in use or more than four players were on a court, the same risks existed whether Mr. Morgan or a nonprofit group was conducting the program. Mr. Barbe also acknowledged that Mr. Morgan provided direct revenue for the Tennis Center, and that indirect revenue was generated by those who became interested in the game through participation in his programs.
*414 After trial, the matter was held open for the submission of post-trial memoranda by the parties. On September 9, 1998, the court rendered judgment in favor of the Morgans. In the accompanying written reasons, the court explained that the evidence clearly established unequal enforcement of the rules at issue, but the defendants had failed to establish a rational basis for this discrimination. The court particularly noted Mr. Barbe’s admission “that from a safety and public enjoyment standpoint, there is no reason for the distinction” between nonprofit and for-profit programs, as well as his agreement that, whether or not Mr. Morgan was 1 incertified by any organization, his skill and competence as an instructor was not questioned. Therefore, the Park was ordered not to enforce the complained-of rules against the plaintiffs, and general damages for mental anguish, emotional distress, inconvenience and harassment were awarded in the amount of $2,500 for Iris Morgan and $10,000 for Sundance Morgan.
DISCUSSION
In their appeal from this judgment, Mr. Whaley and the City Park Improvement Association assert, among other things, that the trial court erred in its finding of unlawful discrimination based solely upon the safety aspects of the rules at issue.[3] The defendants argue that the classifications created by the Tennis Center’s rules further the legitimate state interests of maximizing Park revenue and promoting public enjoyment, as well as safety. Because enforcement of the rules bears a rational relationship to those ends by distinguishing between the Park’s staff instructors, for-profit programs, and nonprofit, community service groups, they contend that the evidence failed to establish a violation of the Morgans’ rights to equal protection.
Both the Fourteenth Amendment of the United States Constitution and Article I, Section 3 of the Louisiana Constitution provide that all persons are entitled to equal protection of the law. These provisions mandate “that persons similarly situated receive like treatment.” Whitnell v. Silverman, 95-0112, pp. 9-10 (La.12/6/96), 686 So.2d 23, 29-30. While claims may be subject to a different analysis under the federal and state guarantees, a minimal standard of review applies under both provisions where, as here, there is no fundamental right, suspect | n class, or enumerated characteristic alleged as the basis for discrimination. Progressive Security Ins. Co. v. Foster, 97-2985, pp. 17-19 (La.4/23/98), 711 So.2d 675, 685-87. Under these, standards, an individual claiming an equal protection violation has the burden of establishing that a discriminatory classification “is not rationally related to any legitimate governmental interest” or that it “does not suitably further any appropriate state interest.” Id.
In this case, the plaintiffs stipulated that City Park’s rules are rationally related to the legitimate goals of revenue raising, public enjoyment and safety. The Morgans complain, however, that enforcement of the rules against Team Sundance, while allowing the exceptions for nonprofit programs and community service events, fails to serve these objectives. They thus maintain that the trial court correctly found that this unequal enforcement constituted unlawful discrimination. We disagree.
It is clear that, as Mr. Bassich testified, neither the Park nor the recreational facilities within its borders can be operated or maintained unless sufficient revenues are generated. Therefore, when governmental funding was discontinued in 1987, the fees *415 imposed on those using the Park’s tennis courts had to be increased. However, because the need for revenue had to be balanced against the public’s right of access, the Board of Commissioners .had a legitimate basis for rejecting a uniform system of fees based solely upon operational costs.
The effect of the fee structure instituted in 1988 is to distinguish between those who merely use the City Park tennis courts for recreation and those who use the facilities for personal gain. As he admitted at trial, Mr. Morgan and many other individuals had been able to conduct profitable businesses providing tennis instruction based upon the minimal rental costs and lack of regulation at City Park. After 1987, in contrast, the ability to profit from group lessons is now hampered by l^the limitations on the number of balls and people on the courts. However, if an instructor is willing to share a portion of the fees paid by his or her students, the lessons may be facilitated by the use of baskets of balls, and more than four people will be allowed on the court. Thus, under the new rules, the Park can derive the benefit of increased revenue from those who use the tennis courts to operate a business, rather than to merely play a game of tennis. This distinction clearly and reasonably furthers the stipulated governmental interest in revenue raising. The instructors who are unwilling to affiliate with the Tennis Center and share their fees with the Park cannot expect to share the benefits afforded to those who do. Therefore, it is not unlawful discrimination for Mr. Morgan to be subject to the rules that apply to the general public.
Similarly, the exemption from enforcement of the rules that is allowed for nonprofit and community service groups is rationally related to the Park’s interest in public enjoyment. The programs conducted by groups such as NORD, The Louis Armstrong Group, the New Orleans and U.S. Tennis Associations, and even the commercially sponsored “Traveling World Tennis Tour” were shown to attract participants from a greater area, even statewide. This increase in the number of people making use of the Park’s facilities clearly promotes the legitimate goal of ensuring that the Tennis Center remain accessible for all citizens, not merely those who can pay for tennis instruction. Although it was admitted that Mr. Morgan’s programs also contribute to increased use of the Park’s facilities, his fee-for-service status distinguishes him from these organizations that charge little, if anything, for participation. Therefore, it is not unlawful discrimination for the Park to allow exceptions from the Tennis Center rules for such groups, but not for Team Sundance.
Finally, our review of the evidence fails to support any finding of | ^discriminatory enforcement of the rules against the Morgans as compared to other “for-profit” instructors or groups. Both plaintiffs testified that virtually all of those individuals who had been giving tennis lessons at the Park prior to 1988 eventually either became affiliated with the Tennis Center or began using other facilities. Similarly, although the Park did not obtain immediate compliance from school programs, with the new rules and regulations, there was no evidence that any school, group, or individual was knowingly allowed to operate in violation of the limitations on a continuing basis. Notwithstanding Mr. Morgan’s 1989 photo of a private daycare center or Mr. Trinh’s one-time observation of a private high school using baskets of balls, there was no showing of any significant or intentional lack of enforcement of the Tennis Center’s rules by the Park. Instead, the Tennis Center staff attempted, to the best of their abilities, to enforce the limitations against all who were similarly situated to the Morgans.
Because we thus find no basis for the trial court’s finding that the Morgans were entitled to damages for unlawful discrimination, we need not address the issue raised in their answer to the appeal.
*416 CONCLUSION
For the reasons assigned, the judgment in favor of Iris and Sundance Morgan is reversed. Judgment is rendered in favor of defendants, Thomas Lee Whaley, III and the New Orleans City Park Improvement Association, dismissing plaintiffs’ claims with prejudice, with each party to bear their own costs.
REVERSED AND RENDERED.

. Mr. Morgan testified that while his legal name is James O'Connell Morgan, Jr., he uses the name "Sundance” for all business as well as social purposes.

. Mr. Morgan said that these weekend programs were mostly adults, but with some "junior” players; men played on Saturdays and women on Sundays.

. While defendants also challenged the court's authority to prohibit enforcement of the rules at issue, the briefs and arguments presented to this court indicate that post-trial modifications in the Park’s rules and regula-lions led to Mr. Morgan’s eventual affiliation with the teaching staff. Therefore, we preter-mit discussion of the trial court’s grant of equitable relief.